# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| KINDER MORGAN, INC., INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, AMERICAN PETROLEUM INSTITUTE, ENBRIDGE (U.S.) INC., BUCKEYE POWER, INC., OHIO VALLEY ELECTRIC CORPORATION, and UNITED STATES STEEL CORPORATION<br><br><br>*Petitioners*,<br><br>v.<br><br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. EPA,<br><br><br>*Respondents*. | Case No.:25-1054 |

## JOINT PETITION FOR REVIEW

Pursuant to Clean Air Act section 307(b)(1), 42 U.S.C. § 7607(b)(1), the

Administrative Procedure Act, 5 U.S.C. § 702, Federal Rule of Appellate Procedure

15(a), and D.C. Circuit Rule 15, Kinder Morgan, Inc., the Interstate Natural Gas

Association of America, the American Petroleum Institute, Enbridge (U.S.) Inc.,

Buckeye Power, Inc., Ohio Valley Electric Corporation, and United States Steel

1

Corporation ("Petitioners") hereby petition this Court for review of Respondent United States Environmental Protection Agency's ("EPA") and then-Administrator Michael S. Regan's published action: Interim Final Rule entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards; Notice on Remand of the Record of the Good Neighbor Plan To Respond to Certain Comments." 89 Fed. Reg. 99,105 (Dec. 10, 2024) ("Supplement").

The Supplement purports to remedy the errors that *Ohio v. EPA*, 603 U.S. 287 (2024), identified in an earlier and related EPA rule, the "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 36,654 (June 5, 2023). The Supplement purports to "demonstrate that the [series of federal implementation plans] fulfills the statutory mandate for each state regardless of the number of states included in the rule at any given time." *Id.* at 99,106.

The Good Neighbor Plan is the subject of numerous challenges before this Court consolidated in *Utah v. EPA*, No. 23-1157 (D.C. Cir.), and was stayed pending judicial review by the Supreme Court in *Ohio*.

This petition for review is timely filed, as it is filed within sixty days of the challenged action's publication in the Federal Register. *See* 42 U.S.C. § 7607(b)(1). This Court has jurisdiction for this action under 42 U.S.C. § 7607(b)(1). Moreover, in order to proceed expeditiously and avoid delay over venue disputes, Petitioners "waive" any challenge to venue in this Court. *Tex. Mun. Power Agency v. EPA*,

89 F.3d 858, 867 (D.C. Cir. 1996). In doing so, Petitioners in no way disagree with

judicial decisions reaching a different outcome on venue such as *Kentucky v. EPA*,

123 F.4th 447, 457–467 (6th Cir. 2024). *See also Oklahoma v. EPA*, S. Ct. No. 23-

1067 (active Supreme Court case evaluating venue under 42 U.S.C. § 7607(b)(1)).


Dated: February 7, 2025          Respectfully submitted,

| | |
|---|---|
| /s/ *Kathleen Mueller* | /s/ *Ana Maria Gutiérrez* |
| Samuel B. Boxerman | Ana Maria Gutiérrez |
| Kathleen Mueller | Michael Dean Miller |
| SIDLEY AUSTIN LLP | WOMBLE BOND DICKINSON (US) LLP |
| 1501 K Street, NW | 1601 19th Street |
| Washington, DC 20005 | Denver, CO 80202 |
| (202) 736-8000 | Ana.Gutierrez@wbd-us.com |
| sboxerman@sidley.com | |
| | *Counsel for Kinder Morgan, Inc.* |
| *Counsel for Interstate Natural* | |
| *Gas Association of America and* | |
| *American Petroleum Institute* | |
| | /s/ *Michael E. Born* |
| /s/ *Laura K. McAfee* | Michael E. Born |
| Laura K. McAfee | Cheri A. Budzynski |
| BEVERIDGE & DIAMOND, PC | Krystina E. Garabis |
| 201 North Charles Street, Suite 2200 | SHUMAKER, LOOP & KENDRICK, LLP |
| Baltimore, MD 21201 | Huntington Center |
| 410-230-1300 | 41 South High Street, Suite 2400 |
| lkmcafee@bdlaw.com | Columbus, OH 43215 |
| *Counsel for Petitioner Enbridge (U.S.)* | (614) 463-9441 |
| *Inc.* | mborn@shumaker.com |
| | cbudzynski@shumaker.com |
| | kgarabis@shumaker.com |
| | |
| | *Counsel for Petitioners Buckeye* |
| | *Power, Inc. and the Ohio Valley* |
| | *Electric Corporation* |

*/s/John D. Lazzaretti*
John D. Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone:  (216) 479-8500
Facsimile:   (216) 479-8780
Email:  john.lazzaretti@squirepb.com

*Counsel for Petitioner United States*
*Steel Corporation*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| KINDER MORGAN, INC., *et al.* | Case No.:25-1054 |
| *Petitioner*, | |
| v. | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, Administrator, U.S. EPA, | |
| *Respondents*. | |

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Kinder Morgan, Inc. is a publicly held corporation. Kinder Morgan does not have a parent corporation, and no publicly held corporation holds 10% or more of Kinder Morgan's stock.

Interstate Natural Gas Association of America ("INGAA") is a national trade association that represents interstate natural gas transmission pipeline companies. INGAA has no parent corporation, and no publicly held corporation has a 10% or greater ownership in INGAA.

American Petroleum Institute ("API") is a national trade association that represents all segments of America's natural gas and oil industry. API has no parent corporation, and no publicly held corporation has a 10% or greater ownership in API.

Enbridge (U.S.) Inc. is a diversified energy company headquartered in Calgary, Canada, whose holdings include oil pipelines regulated by the Federal Energy Regulatory Commission. Enbridge (U.S.) Inc. is a publicly traded company that trades on the New York and Toronto stock exchanges. Enbridge (U.S.) Inc. has no parent companies and no publicly held company owns a 10 percent or greater interest in Enbridge (U.S.) Inc.

Buckeye Power, Inc. is an Ohio nonprofit corporation operating on a cooperative basis, a so-called generation and transmission electric cooperative or G&T, that provides wholesale electric service to its twenty-five members constituting all of the electric distribution cooperatives engaged in the retail sale of electricity within the State of Ohio, twenty-four of which are also Ohio nonprofit corporations operating on a cooperative basis. Buckeye owns or controls the output of natural gas-fired and coal-fired power plants to supply the wholesale power requirements of its members. It is wholly owned by its twenty-five member electric distribution cooperatives, none of which are publicly traded. Buckeye Power, Inc.

does not have a parent corporation and no publicly held corporation owns 10% or more of its stock or other membership interests.

Ohio Valley Electric Corporation is not a publicly-held corporation.

United States Steel Corporation is organized under the laws of Delaware and its corporate headquarters are located at 600 Grant Street, Pittsburgh, PA 15219. It produces iron and steel products for the automotive, construction, appliance, energy, containers, and packaging industries. It is a publicly held company and Blackrock Inc., a publicly held corporation, owns 10% or more of its stock.

Dated: February 7, 2025

Respectfully submitted,

/s/ *Kathleen Mueller*
Samuel B. Boxerman
Kathleen Mueller
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
sboxerman@sidley.com

*Counsel for Interstate Natural Gas Association of America and American Petroleum Institute*

/s/ *Ana Maria Gutiérrez*
Ana Maria Gutiérrez
Michael Dean Miller
WOMBLE BOND DICKINSON (US) LLP
1601 19th Street
Denver, CO 80202
Ana.Gutierrez@wbd-us.com

*Counsel for Kinder Morgan, Inc.*

/s/ *Laura K. McAfee*
Laura K. McAfee
BEVERIDGE & DIAMOND, PC
201 North Charles Street, Suite 2200
Baltimore, MD 21201
410-230-1300
lkmcafee@bdlaw.com
*Counsel for Petitioner Enbridge (U.S.)
Inc.*

/s/ *Michael E. Born*
Michael E. Born
Cheri A. Budzynski
Krystina E. Garabis
SHUMAKER, LOOP & KENDRICK, LLP
Huntington Center
41 South High Street, Suite 2400
Columbus, OH 43215
(614) 463-9441
mborn@shumaker.com
cbudzynski@shumaker.com
kgarabis@shumaker.com

*Counsel for Petitioners Buckeye
Power, Inc. and the Ohio Valley
Electric Corporation*

/s/John D. Lazzaretti
John D. Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8780
Email: john.lazzaretti@squirepb.com

*Counsel for Petitioner United States
Steel Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused a true and correct copy of the foregoing

Petition for Review to be served by U.S. Mail, postage prepaid, addressed to the

following:

Hon. Lee Zeldin
Office of the Administrator (1101A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Hon. Pam Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Correspondence Control Unit
Office of General Counsel (2310A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460

Dated February 7, 2025

/s/ *Ana Maria Gutiérrez*
Ana Maria Gutiérrez
Womble Bond Dickinson (US) LLP
*Counsel for Kinder Morgan, Inc.*

# ADDENDUM

(6) UL 60079–28, Standard for Safety for Explosive Atmospheres—Part 28: Protection of Equipment and Transmission Systems Using Optical Radiation, Second Edition, Dated September 15, 2017, including revisions through December 7, 2021 (ANSI/UL 60079–28); into § 18.101.

Note 1 to § 18.102: The voluntary consensus standards listed in this section may also be obtained from the American National Standards Institute (ANSI), 1899 L Street NW, 11th Floor, Washington, DC 20036, phone: (202) 293–8020; website: *www.ansi.org.*

### § 18.103 Review and update of applicable voluntary consensus standards.

(a) MSHA will review more recent editions of voluntary consensus standards listed in § 18.102 to determine whether they can be used in their entirety and without modification, in lieu of the requirements in subparts B through E of this part.

(b) MSHA may review voluntary consensus standards not approved for incorporation by reference (IBR) in § 18.102 to determine whether such standards are suitable for gassy mining environments and whether they provide protection against fire or explosion, if substituted in their entirety and without modification, in lieu of the requirements in subparts B through E of this part.

(c) Following such review and determination, MSHA will use the appropriate rulemaking process to amend the list of voluntary consensus standards approved for IBR in lieu of the requirements in subparts B through E of this part.

### PART 740—COAL MINE DUST SAMPLING DEVICES

■ 6. The authority citation for part 74 continues to read as follows:

**Authority:** 30 U.S.C. 957.

### § § 74.5 and 74.11 [Amended]

■ 7. In § § 74.5(b) and 74.11(d), remove "30 CFR 18.68" and add in its place the term "30 CFR part 18."

[FR Doc. 2024–28315 Filed 12–9–24; 8:45 am]

**BILLING CODE 4520–43–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 52, 75, 78, and 97

[EPA–HQ–OAR–2021–0668; FRL–8670.5–02–OAR]

RIN 2060–AW47

### Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Notice on Remand of the Record of the Good Neighbor Plan To Respond to Certain Comments

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice; supplemental response to comments.

**SUMMARY:** The Environmental Protection Agency (EPA) is addressing certain comments that were submitted on the proposed Good Neighbor Plan that the Supreme Court of the United States concluded the EPA had likely not sufficiently addressed in the final Good Neighbor Plan. The EPA is providing a fuller explanation of its reasoning at the time of its action in response to these comments. The Good Neighbor Plan addressed 23 states' obligations to eliminate significant contribution to nonattainment or interference with maintenance of the 2015 ozone national ambient air quality standards (NAAQS), pursuant to the "good neighbor" provision of the Clean Air Act (CAA or Act). On September 12, 2024, the D.C. Circuit Court of Appeals remanded the record of the Good Neighbor Plan to the EPA to permit the Agency to further respond to comments related to the Good Neighbor Plan's operation if one or more upwind States were no longer participating. In this document, the EPA responds to the comments by more fully explaining why the Good Neighbor Plan appropriately defines each state's obligations, regardless of the status of the rule in other states, and can be implemented without modification in any individual state or combination of states covered by the rule.

**DATES:** December 10, 2024.

**ADDRESSES:** The EPA has established a docket for this document under Docket ID No. EPA–HQ–OAR–2021–0668. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form.

Publicly available docket materials are available electronically through *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Gwyndolyn Sofka, OAQPS–AQPD (C541–04), Environmental Protection Agency, 109 TW Alexander Dr, Research Triangle Park, NC 27711; telephone number: (919)–541–5121; email address: *sofka.gwyndolyn@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

Throughout this document "we," "us," and "our" refer to the EPA.

### I. General Information

The EPA is responding to a set of comments that together raise a question regarding the method by which the Agency developed the Good Neighbor Plan (88 FR 36654; June 5, 2023). Namely: would the conclusions the EPA reached regarding states' obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS have been different, had the rule been promulgated for, or if it covered, a smaller or different group of states than the 23 states that were included in that the rule? In short, for reasons that are provided in the record of the Good Neighbor Plan itself and elaborated upon in this document, the answer to that question is no. The EPA applied its 4-step interstate transport analytical framework in the Good Neighbor Plan to determine each included state's obligations. That framework, which accounts for the multistate "collective contribution" nature of ozone problems throughout the United States, nonetheless defines the amount of emissions from each state that constitutes "significant contribution to nonattainment or interference with maintenance" of the NAAQS in other states and implements programs to prohibit those emissions through federal implementation plans (FIPs) promulgated for each state accordingly. As the Good Neighbor Plan itself indicated, the EPA's methodology is designed to be applicable in any state that may become subject to a federal plan to address its "significant contribution" to other states' ozone problems for the 2015 ozone NAAQS; it provides an equitable and efficient solution to a "thorny causation problem," *EME Homer City,* 572 U.S. 489, 514 (2014), by holding any linked state's largest industrial $NO_X$-emitting sources to widely achievable emissions levels, and ensures fairness among states by not being dependent on the order in which they are addressed.

By issuing this document, the Agency is addressing a particular issue that the

U.S. Supreme Court preliminarily found had been raised by commenters with reasonable specificity, but which the Court considered the Agency had likely failed to adequately address when it originally promulgated the rule. *See Ohio* v. *EPA,* 144 S. Ct. 2040 (2024) (granting applications to stay enforcement of the Good Neighbor Plan pending judicial review). This document summarizes the relevant comments identified by the Supreme Court and, after summarizing our initial responses to these comments in section II.B., provides a fuller response in section III. of this document concerning how these comments relate or could be read as relating to the question of the Good Neighbor Plan's application and severability on a state-by-state basis, consolidating material and discussions from the existing administrative record at the time the EPA issued the action. To provide the most complete possible response to the issues identified by the Supreme Court, the Agency has considered these comments from all angles, even considering arguments that are not evident on the face of the comments themselves. For this reason, we do not concede that each of the topics discussed in this document was in fact raised with "reasonable specificity" by the commenters themselves, as required by CAA section 307(d)(7)(B), but the Agency views it to be appropriate in light of the Court's preliminary findings in *Ohio* to address all of the issues commenters potentially could be seen to have raised, to ensure a thorough and complete response to the commenters' concerns.

In responding to these comments, the Agency is relying solely on the information and data available in the record at the time the Good Neighbor Plan was signed by the EPA Administrator and promulgated on March 15, 2023 (88 FR 36654; June 5, 2023). *See* CAA section 307(d)(6)(C) (limiting the basis for CAA rules issued under section 307(d) to "information [and] data . . . placed in the docket as of the date of [ ] promulgation"). The purpose of this document is not to supplement the record of the Good Neighbor Plan with new findings, information, data, or new record support, but rather only to consolidate the existing material in the record to more fully respond to the relevant comments received during the public comment period following proposal of the Good Neighbor Plan. In this document, we provide an "amplified articulation" of the methodology underlying the design of the Good Neighbor Plan to more fully explain

why, at the time the EPA issued the Good Neighbor Plan, it understood the Good Neighbor Plan's requirements to reasonably function on a state-by-state basis and therefore to be severable by state. *See Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.,* 591 U.S. 1, 20–21 (2020) (quoting *Alpharma, Inc.* v. *Leavitt,* 460 F. 3d 1, 5–6 (D.C. Cir. 2006)).

Thus, in this document, we compile and present together discussions and components of the analysis that are already in the record and explain how they relate to one another and together demonstrate that the Good Neighbor Plan fulfills the statutory mandate for each state regardless of the number of states included in the rule at any given time.

As described in more detail in section II.A. of this document, following the Supreme Court's opinion in *Ohio,* the EPA sought a voluntary partial remand of the Good Neighbor Plan from the D.C. Circuit to provide the explanation that the Supreme Court concluded was likely lacking in the Good Neighbor Plan. The D.C. Circuit ordered "that the record be remanded to permit the Environmental Protection Agency to further respond to comments in the record." *State of Utah et al.* v. *EPA,* No. 23–1157 (D.C. Cir. September 12, 2024).

The statutory authority for the Good Neighbor Plan is provided by the CAA as amended (42 U.S.C. 7401 *et seq.*). The most relevant portions of CAA section 110 are subsections 110(a)(1), 110(a)(2) (including 110(a)(2)(D)(i)(I)), and 110(c)(1). For further information, *see* section II.C. of the preamble for the Good Neighbor Plan, 88 FR 36667–68.

## II. Background

### A. Procedural History

On March 15, 2023, in accordance with CAA sections 110(a)(2)(D)(i)(I) and 110(c)(1), the EPA promulgated the Good Neighbor Plan, a rule determining the good neighbor obligations of 23 states with respect to the 2015 ozone NAAQS and establishing for these states federal implementation plans (FIPs) for emissions sources in these states to address each state's obligations by reducing emissions of nitrogen oxides (NO$_X$), an ozone precursor.[1] Prior to promulgating the Good Neighbor Plan, the EPA had disapproved state implementation plans for 21 of those states and had found that several states had failed to submit complete plans— predicates to EPA's authority to

promulgate FIPs for those states.[2] Following the Good Neighbor Plan's promulgation, in response to judicial orders partially staying the SIP Disapproval as to several states, the EPA issued two sets of interim amendments (referred to here as the First and Second Interim Final Rules) staying the Good Neighbor Plan's effectiveness for emissions sources in those states pending the resolution of judicial review of that action and further EPA rulemaking.[3] As modified by the First and Second Interim Final Rules, the Good Neighbor Plan's FIPs applied to electric generating units (EGUs) within the borders of Illinois, Indiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia, and Wisconsin and to non-EGU sources within the borders of nine of the same ten states (all except Wisconsin) as well as California.[4]

In October 2023, after the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) denied motions to stay the Good Neighbor Plan pending judicial review,[5] four sets of parties submitted emergency applications to the United States Supreme Court seeking a stay of some or all of the Good Neighbor Plan's requirements.[6] In an opinion issued on

---

[1] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023).

[2] Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 FR 9336 (February 13, 2023) ("SIP Disapproval"); Findings of Failure to Submit a Clean Air Act Section 110 State Implementation Plan for Interstate Transport for the 2015 Ozone National Ambient Air Quality Standards (NAAQS), 84 FR 66612 (December 5, 2019) (including Pennsylvania, Utah, and Virginia).

[3] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States, 88 FR 49295 (July 31, 2023); Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Additional Judicial Stays of SIP Disapproval Action for Certain States, 88 FR 67102 (September 29, 2023).

[4] The Good Neighbor Plan's emissions reduction requirements apply to all emissions sources meeting the Good Neighbor Plan's applicability criteria within the borders of each covered state, including sources in Indian country within the borders of the state. *See* 88 FR 36690.

[5] Orders, *Utah* v. *EPA,* No. 23–1157 (D.C. Cir. September 25, 2023, and October 11, 2023); *see also* Order, *Utah* v. *EPA,* No. 23–1157 (D.C. Cir. December 4, 2023) (denying additional stay motions).

[6] *Ohio* v. *EPA,* No. 23A349 (U.S. docketed October 18, 2023) (other named applicants are Indiana and West Virginia); *Kinder Morgan, Inc.* v. *EPA,* No. 23A350 (U.S. docketed October 18, 2023) (other named applicants are Enbridge (U.S.) Inc., TransCanada PipeLine USA Ltd., Interstate Natural Gas Association of America, and American Petroleum Institute); *American Forest & Paper Association* v. *EPA,* No. 23A351 (U.S. docketed October 18, 2023) (other named applicants are America's Power, Associated Electric Cooperative, Inc., Deseret Power Electric Cooperative, Midwest Ozone Group, National Mining Association, National Rural Electric Cooperative Association,

June 27, 2024 (referred to here as the Stay Order), the Supreme Court granted the emergency applications and ordered that "[e]nforcement of EPA's rule against the applicants shall be stayed" while judicial review of the Good Neighbor Plan on the merits proceeds, first in the D.C. Circuit and then potentially in the Supreme Court.[7]

The Court found that, with respect to the "explanation why the number and identity of participating States does not affect what measures maximize cost-effective downwind air-quality improvements," the stay applicants "are likely to prevail on their argument that EPA's final rule was not 'reasonably explained,' that the agency failed to supply 'a satisfactory explanation for its action[,]' and that it instead ignored 'an important aspect of the problem' before it". *Ohio* v. *EPA,* 144 S. Ct. 2040, 2054 (2024) (citations omitted). The Court focused in particular on the fact that the Good Neighbor Plan's FIPs had been stayed in several states pending judicial review of the EPA's disapproval of those states' state implementation plan (SIP) submissions. 144 S. Ct. at 2051–52. Stay applicants had argued that the "EPA's plan rested on an assumption that all 23 upwind States would adopt emissions-reduction tools up to a 'uniform' level of 'costs' to the point of diminishing returns" and the EPA had not explained how the rule was substantiated for a smaller number of states. *Id.* at 2053 (citations omitted). The Court preliminarily interpreted several comments filed on the proposed Good Neighbor Plan as raising this concern, *i.e.,* that if a different number or grouping of states were subject to the EPA's FIPs promulgated in the Good Neighbor Plan rulemaking, then the EPA's cost-effectiveness analysis would have changed, and therefore the obligations would or could be different for the remaining states. *Id.* at 2050–51. The Court did not conclude that the EPA's methodology was unlawful, or that petitioners were correct in their assessment that the Good Neighbor Plan's obligations could change depending on the number or group of states subject to it. Rather, the Court preliminarily found that the EPA had failed to adequately respond to the relevant comments and thus the rule was likely not "reasonably explained." *Id.* at 2054. The Court noted that the rule's "severability" discussion did not adequately address the issue, since that discussion, in itself, contained no supporting analysis. *Id.* at 2054–55.

On March 27, 2024, several months before the Supreme Court issued this ruling, the EPA partially denied several petitions for reconsideration of the Good Neighbor Plan objecting to the rule on the basis that it had been stayed in certain states and was no longer lawful or workable in the remaining states, as well as objecting that the rule should not have been published at all following judicial stays of the SIP disapproval as to certain states. The EPA's "basis for denial" addressed both issues and determined that these objections were not "centrally relevant" because, after examining the objections in detail, the EPA concluded they failed to establish that the rule should be revised. *See* 89 FR 23526 (April 4, 2024) (providing notice of issuance of the partial denial).[8] The Supreme Court declined to consider the EPA's Denial in evaluating the applications for stay. *See* 144 S. Ct. at 2068 n.11.

Following the Supreme Court's decision granting the applications to stay enforcement of the Good Neighbor Plan, the EPA implemented the Court's stay of the effectiveness of the Good Neighbor Plan's requirements for the sources that would have been subject to the rule pursuant to the 23 states' FIPs originally promulgated, pending judicial review. *See* 89 FR 87960 (November 6, 2024). In addition, the EPA sought a voluntary partial remand of the Good Neighbor Plan. The D.C. Circuit granted a remand of the record of the rule so that the EPA might respond to the comments related to the rule's appropriateness for each state and operation. *State of Utah et al.* v. *EPA,* No. 23–1157 (D.C. Cir. September 12, 2024). The D.C. Circuit retains jurisdiction of the case, has placed the case in abeyance pending further order of the court, and has directed the parties to file motions to govern future proceedings in the case within 30 days after completion of this remand or December 30, 2024, whichever is earlier. *Id.*

The following section, II.B. of this document, summarizes the comments identified by the Supreme Court as relevant to the issue of the Good Neighbor Plan's operation if one or more upwind States were no longer participating and provides a summary of the EPA's responses to these comments in the Good Neighbor Plan with citations to the record.[9] The EPA does not intend to reopen its prior response to those comments through this document by summarizing those prior responses. Section III. of this document provides a fuller explanation in response to a specific issue identified by the Supreme Court derived from these comments: whether the Good Neighbor Plan would lawfully define and implement good neighbor obligations for any particular state if it were not in effect for some other state or states. As the EPA originally concluded based on the information in the record at the time of promulgation, the Good Neighbor Plan appropriately defines each state's obligations on an individual basis and is severable on a state-by-state basis. *See* 88 FR 36693.

*B. Summary of Comments Identified by the Supreme Court and Citation to Prior Responses to Comments*

*Comment category 1 (SIP/FIP sequencing):* Multiple commenters (the Missouri Department of Natural Resources (MO DNR), the Louisiana Department of Environmental Quality (LA DEQ), and the Texas Commission on Environmental Quality (TX CEQ)) expressed concern that the EPA had proposed FIPs prior to finalization of the SIP disapprovals for states included in the FIP rulemaking, without knowing which states would ultimately be covered by a FIP. Commenters state that this kept the EPA from being able to receive and consider the technical, procedural, and legal issues that they identified in their comments. Commenters state that the proposed FIPs presume the result of the proposed disapproval of SIPs even though the comment period for the SIP Disapproval action was ongoing at the time of the proposed FIPs.

Commenters (LA DEQ and TX CEQ) requested that the EPA withdraw both the proposed FIPs for their states and the proposed SIP disapproval so that both states could have a further opportunity to show that their respective SIPs address their supposed significant contribution to nonattainment or interference with maintenance in downwind states. One commenter (MO DNR) requested that the EPA withdraw the proposed FIP for

---

Ohio Valley Electric Corporation, Portland Cement Association, and Wabash Valley Power Alliance); *United States Steel Corporation* v. *EPA,* No. 23A384 (U.S. docketed October 31, 2023).

[7] *Ohio* v. *EPA,* 144 S. Ct. 2040, 2058 (2024).

[8] *See also* "Letter Enclosure: The EPA's Basis for Partially Denying Petitions for Reconsideration of the Good Neighbor Plan on Ground Related to Judicial Stays of the SIP Disapproval Act as to 12 States," *available at https://www.epa.gov/Cross-State-Air-Pollution/response-four-petitions-reconsideration* and at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1255.*

[9] We have focused specifically on the comments that the Supreme Court identified in *Ohio* v. *EPA.* While other commenters raised issues similar to these comments, these comments present a representative set of perspectives on those issues that the Supreme Court viewed as most closely related to the question of the Good Neighbor Plan's severability by state.

Missouri and other states so that the EPA can consider and respond to all comments received on the SIP Disapproval action. The commenter goes on to request that the EPA respond to all comments on the proposed disapproval of the Missouri SIP in the final action for the Good Neighbor Plan if it does not withdraw the proposed FIP, as the SIP Disapproval action and the proposed FIP are ''inextricably linked.'' [10] Relevant portions of the comment are included immediately below.

## Missouri Department of Natural Resources

EPA is now proposing good neighbor FIPs, which are the subject of this comment letter, before even finalizing the SIP disapprovals for Missouri and numerous other states. The Air Program and several other entities submitted adverse comments on EPA's proposed SIP disapproval for Missouri's 2019 Good Neighbor SIP. Those comments were all submitted after the publication of EPA's proposed good neighbor FIP in the **Federal Register**. Therefore, EPA did not even give itself a chance to receive, and much less, consider all the technical, legal, and procedural issues for the proposed disapproval that were identified in those comments before it moved forward with the proposed FIP. It follows then, that EPA's proposed FIP is extremely premature, and EPA should withdraw the proposal and be obligated to consider and respond to all of the comments it received on the proposed disapprovals before it can propose FIPs for these states.[11]

## Louisiana Department of Environmental Quality

The EPA's proposed FIP presumed the result of its proposed disapproval of Louisiana's SIP submission, even though public notice and comment were ongoing. EPA must consider comments received on its proposed actions. The EPA cannot consider LDEQ's comment on the proposed disapproval of the SIP in good faith, when it has already proposed a FIP prior to the close of the comment period . . . .

Louisiana requests that this proposed FIP be withdrawn, allowing the state to either prove its original SIP submittal through modeling or to provide specific enforceable measures to adequately prohibit the contribution of pollution to downwind states.[12]

## Texas Commission on Environmental Quality

Based on the numerous technical and legal errors discussed in our comments, the TCEQ respectfully requests that the EPA withdraw its proposed FIP, either in whole, or in part as it pertains to Texas. In the alternative, the TCEQ respectfully requests that the EPA address and remedy the numerous technical and legal errors identified by the TCEQ . . . .[13] The inclusion of Texas in the proposed FIP is dependent on the EPA finalizing its proposed disapproval of the transport SIP that Texas timely submitted for the 2015 ozone NAAQS.[14]

*Citations to previous responses:* The EPA explained that FIPs can be proposed before final action is taken on SIP disapprovals, because the statute provides that the EPA is required to promulgate a FIP ''at any time within 2 years'' of a SIP disapproval or a finding of failure to submit. This statutory sequence necessarily permits the *proposal* of a FIP before the finalization of a SIP disapproval. *See* 88 FR 36689 (citing CAA section 110(c)(1); *EME Homer City,* 572 U.S. 489, 509). The EPA was clear in both the proposed and final rulemaking documents that it was issuing FIPs on a state-by-state basis, with adjustments in the scope of states covered by the Good Neighbor Plan's uniform regulatory programs occurring from proposal to final based on changes in the underlying analytics, similar to changes in state coverage that had occurred under prior good neighbor rulemakings.[15] The EPA explained that it had predicate FIP authority for each of the 23 covered states at the time of signature and promulgation of the Good Neighbor Plan. *See* 88 FR 36688–89 and the Good Neighbor Plan Response to Comments (RTC) Document at 6–8.[16] The EPA explained the timing of its action to promulgate FIPs in relation to the need to address good neighbor obligations as expeditiously as practicable, and to the extent possible by the 2023 ozone season, 88 FR 36690, and explained why we would not delay our action to afford states additional opportunities to develop new submissions or instead issue a call for SIP revisions, though we noted that states remain free to develop and submit SIP revisions at any time. *See* Good Neighbor Plan RTC at 12–15. The EPA further explained its reasoning concerning the sequencing of its actions

and that this sequencing did not prejudice the Agency's evaluation of states' SIP submissions in the separate SIP Disapproval action. *See* Good Neighbor Plan RTC at 149–51. The EPA noted that it was not finalizing its proposed FIPs for several states, and the EPA acknowledged that several states remained to be addressed for which it either lacked predicate authority to issue a FIP or because further rulemaking proceedings were appropriate. 88 FR 36658. The EPA explained that specific technical or legal objections to the SIP Disapproval were addressed in that action and were out of scope of the Good Neighbor Plan. *Id.* at 144–45, 155.

*Comment category 2 (potential for new modeling at Steps 1 and 2):* Comments from the Air Stewardship Coalition (ASC) and the Portland Cement Association (PCA) asserted that if the EPA took different action on SIPs than contemplated in the FIP rulemaking proposal, the EPA would be required to conduct a new assessment and modeling of contribution and subject those findings to public comment. In a section titled ''EPA Step Two Screening is Premised on the Premature Disapproval of 19 Upwind States Good Neighbor SIPs'' (sections III.C. and II.C. of their respective comments) the ASC and the PCA stated that the EPA's screening at Step 2 of the 4-step interstate transport framework for the Proposed Good Neighbor Plan included states that already had good neighbor SIPs for the 2015 ozone NAAQS. Commenters state the EPA should not have included these states in this proposed rule's screening as the final disapproval of said SIPs was not issued prior to the proposed FIP. The commenters claim that the EPA rushed to take final action on its good neighbor SIPs when the EPA proposed to disapprove 19 good neighbor SIP submissions and four findings of failure to issue a complete SIP on February 22, 2022. Commenters state that in doing so the EPA prejudged the outcome of the pending SIP actions in their separate FIP action and did not account for the possibility that the EPA may take a different course of action at final than what was proposed in the SIP Disapproval action.

Commenters indicate that as a consequence of this prejudgment the EPA may need to conduct a new assessment and modeling of contribution at Step 2 of the 4-step interstate transport framework if the EPA chooses to take a different action on any of the SIPs they have proposed to disapprove or found as having failed to issue a complete SIP. As such,

---

[10] *See* the Missouri Department of Natural Resources June 17, 2022, comment letter Docket Id No. EPA-HQ-OAR-2021-0668-0289, at 4.

[11] *See id.* at 3.

[12] *See* the Louisiana Department of Environmental Quality June 21, 2022, comment letter Docket Id No. EPA-HQ-OAR-2021-0668-0365, at 2.

[13] *See* the Texas Commission on Environmental Quality June 21, 2022, comment letter Docket Id No. EPA-HQ-OAR-2021-0668-0505, at 1.

[14] *Id.* at 2.

[15] *See, e.g.,* 87 FR 20036, 20038, 20039, 20040 n.8, 20041, 20044, 20045, 20051 n.39, 20051–2–52, 20058, 20067 n.115, 20073, and 20140 (April 6, 2022); 88 FR 36654, 36656, 36657, 36658, 36659 n.9, 36659, 36662, 36664, 36668 n.41 & 44, 36668/3, 36669, 36673/2, 36688 n.99, and 36689 (June 5, 2023).

[16] Available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1127.*

commenters urged the EPA to stay action on the proposals and coordinate with states to ensure the appropriate sequence of actions is taken. The relevant text of the ASC's comment is included immediately below.[17]

Yet, it appears EPA is rushing to take final action as EPA on February 22, 2022, proposed to disapprove 19 Good Neighbor SIP submissions. EPA also issued proposed findings of failure to issue a complete SIP for NM, PA, UT, and VA. The proposed FIP essentially prejudges the outcome of those pending SIP actions and, in the event EPA takes a different action on those SIPs than contemplated in this proposal, it would be required to conduct a new assessment and modeling of contribution and subject those findings to public comment.[18]

*Citations to previous responses:* The EPA explained that, partially in response to comments concerning technical issues with the modeling used at proposal for Steps 1 and 2, it conducted a new round of modeling and air quality analysis at Steps 1 and 2 in taking final action on the SIP Disapproval and the Good Neighbor Plan. 88 FR 36673–74; 88 FR 9339. The EPA explained that it also reviewed recent ozone monitoring data indicating persistent elevated ozone levels at many locations throughout the country. *Id.* at 36704–05. The EPA explained that for most states its updated air quality analysis for the final rule was confirmatory of its proposed findings concerning which states contribute to downwind receptors at Step 2, and even its older 2011-based modeling. *Id.* at 36674, 36707. The EPA explained that where its updated analysis at Steps 1 and 2 indicated that a state was not contributing or that the basis for finding contribution had changed, it was not finalizing a FIP for that state in the Good Neighbor Plan; the EPA indicated its intent to address these and other states in subsequent actions. *Id.* at 36656, 36658, 36689; *see also* SIP Disapproval, 88 FR 9354.[19]

*Comment category 3 (cost-effectiveness at Step 3):* Comments from ASC, PCA, the Indiana Municipal Power Agency (IMPA), the Lower Colorado River Authority (LCRA), and the Wisconsin Paper Council (WPC) question the methodology by which the EPA identified a cost-threshold used to establish the cost-effectiveness of the proposed controls.

Commenters (ASC and PCA) both ask the EPA to reconsider the $7,500/ton average marginal cost-effectiveness threshold used for non-EGUs stating that it is too high and a departure from past practices. Both commenters state the EPA has failed to explain why the EPA relied on a "knee in the curve" approach instead of the past "clear breakpoint" approach to determine the $7,500/ton number. Commenters state that there is no noticeable break at that point for Tier 1 industries but there is a break at $1,600/ton mark; however, commenters concede there is a difference at $7,500/ton in Tier 2 industries and the combined Tier 1 and 2 industries line. In addition, commenters question why the EPA departed from the cost-effectiveness threshold used in the 2021 Revised CSAPR Update Rule ($2,000/ton in $2016) as it appears to commenters that the EPA had not collected any new information on costs or technologies or used different implementation timelines since the Revised CSAPR Update Rule. The relevant text of the Air Stewardship Coalition's comment is included immediately below.[20]

The Agency's sole analysis is that there was a "knee in the curve" that identified $7,500 per ton, but that is not obvious to a reviewer. There is no noticeable difference around $7,500 in the plotted line for Tier 1 industries, instead the Tier 1 line reflects a break around the $1,600 mark. While the Tier 2 and combined Tier 1 and 2 lines show some difference around $7,500 mark, there is no explanation for EPA's reliance on a "knee in the curve" as opposed to past transport rules that have relied upon a "clear break point" at this step. Further, EPA has provided no explanation for why the Tier 1 and 2 industries were subject to different contribution thresholds, as described above, yet they were combined when developing the cost-effective control threshold.

In addition, EPA fails to explain why the threshold departs from prior transport rule cost-effectiveness thresholds for non-EGUs. In particular, less than one year before EPA released the Proposed Rule, in the 2021 Revised CSAPR Update Rule, EPA said the non-EGU data demonstrated "a clear break point" (versus a "knee in the curve") at approximately $2,000 (in $2016) per ton.

According to EPA, EPA adopted "that analysis using the best available current data," including the "identified available control technologies," their "costs and potential emissions reductions," and "the information it has regarding control technology implementation timeframes, including information on such timeframes provided by commenters on the proposed rule." Further, to identify levels of control for non-EGUs, EPA used the Control Strategy Tool (CoST) and the projected 2023 inventory from the 2016v1 modeling platform, just as EPA has done in this Proposed Rule. Indeed, there is no indication in the Proposed Rule that EPA collected any new information on costs or technologies or implementation timelines that differed in any material way from the information it analyzed in the Revised CSAPR Update Rule.[21]

Other commenters (IMPA, LCRA, and the WPC) state that cost-effectiveness varies based on operational characteristics of the unit in question, that installing controls on existing EGUs may not be cost-effective, and that emissions from certain industries (specifically pulp and paper mills) would have a negligible effect on air quality.

One commenter (IMPA) objected that requiring a specific type of emissions control will result in a lack of flexibility. They state that the cost-effectiveness of employing selective non-catalytic reduction (SNCR) will be highly variable, and that units employed at peak timeframes will not see similar emissions reductions to those that are used as base load generation. The commenter then states that technology specific dictates are not the best means of emissions control but would prefer controls that maintain flexibility.

To support their claim that the EPA's EGU controls are unlawful because they are not cost-effective, another commenter (LCRA) states that the installation of controls on existing sources (as compared to new sources) is not "per se reasonable or cost-effective."[22] The commenter goes on to state that EGUs that have already invested in state-of-the-art combustion controls have already undertaken significant costs and will have less to gain from additional controls such as a selective catalytic reduction (SCR) retrofit.

Finally, one commenter (WPC) states that the emissions reductions coming from adding controls to pulp and paper mills "would have a negligible effect on

---

[17] *See* Portland Cement Association's June 21, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0516, at 7, for section II.C. of the PCA comment as referenced.

[18] *See* Air Stewardship Coalition's June 21, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0518, at 13–14.

[19] The EPA has conducted or is in the process of conducting additional notice-and-comment rulemaking to address the obligations of those states. *See* 88 FR 88720 (December 19, 2023) (Wyoming); 89 FR 12666 (February 16, 2024) Supplemental Air Plan Actions: Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards and Supplemental Federal "Good Neighbor Plan" Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards ("Supplemental Rulemaking") (proposing action for Arizona, Iowa, Kansas, New Mexico, and Tennessee).

[20] The Portland Cement Association's comment on this topic is nearly identical and can be found at Docket Id No. EPA–HQ–OAR–2021–0668–0516, at 22.

[21] *See* Air Stewardship Coalition's June 21, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0518, at 27.

[22] *See* Lower Colorado River Authority's June 21, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0395, at 21.

air quality." [23] The commenter states that this, coupled with a continued decreasing trend of Wisconsin-based stationary source $NO_X$ emissions, anticipated mobile source $NO_X$ reductions, and additional reductions that they assert were not accounted for in the EPA's analysis, indicates that inclusion of Wisconsin pulp and paper mills are not needed to achieve downwind air quality improvement.

The relevant text of the various commenters is included immediately below.

### Indiana Municipal Power Agency

Not every unit can install or activate SNCR in a way that is cost effective, relative to the actual emissions reductions that the units will experience. Inflated assumptions as to achievable emissions reductions, and underestimated implementation costs have led EPA to presume that compelling the use of SNCR with no regard for the individual circumstances of the EGU in question will be a cost effective means of reducing $NO_X$ emissions. This is not always the case. In IMPA's experience, the effectiveness of SNCR system is highly variable depending on the operational characteristics of the unit, and the level and consistency of its load. Units deployed during peak timeframes, such as IMPA's WWVS units, will not see the same emissions reductions as base load generation. The cost effectiveness of the requirement to employ SNCR will be highly variable, and is unlikely to meet EPA expectations in even the most optimistic case. [24]

### Lower Colorado River Authority

It is clear that Congress believed existing source standards would never exceed new source standards: "[m]ore stringent requirements are imposed on new sources because engineering considerations allow for cheaper and more effective pollution control when the effort is incorporated in the design and construction of the facility." In fact, EPA has previously recognized that less (not more) stringent standards are appropriate for existing units because "controls cannot be included in the design of an existing facility and because physical limitations may make installation of particular control systems impossible or unreasonably expensive in some cases." Controls identified as part of a transport plan should take into account the difficulties of installing controls at existing facilities, but EPA does not do so in this Proposal.

While installing selective catalytic reduction may be the common practice for a *new* fossil-fueled EGU, that does not mean that it is *per se* reasonable or cost-effective for existing plants, especially those that have already invested in other controls to lower their $NO_X$ emissions. Due to the lower

emission rate starting point, plants that have already invested in state-of-the-art combustion controls, such as low-$NO_X$ burners and overfire air, have already undertaken significant costs to achieve $NO_X$ reductions and have less to gain from additional control installation, such as SCR and SNCR. [25]

### Wisconsin Paper Council

Furthermore, pulp and paper mill boilers contribute a small amount of the overall $NO_X$ emissions from sources in the 23 states identified by EPA for emission reductions. Based upon the 2017 National Emissions Inventory, point sources in those states emitted approximately 1.5 million tons of $NO_X$, while pulp and paper mill boilers emitted only about 35,000 tons in those states (2% of point source emissions). In addition, those states also have mobile source emissions of approximately 3.3 million tons per year of $NO_X$, and another 1 million tons of $NO_X$ emissions from biogenic sources, wildfires and prescribed burns.

It is also important to note that the reduction in emissions from pulp and paper mills would have a negligible effect on air quality. For example, the maximum estimated improvement at any receptor for emission controls on 25 pulp and paper mills is 0.0117 ppb, which is significantly below the detection limit of ambient air quality monitors. Thus, the benefit in air quality is too small to even measure. [26]

*Citations to previous responses:* The EPA explained that, as it had in all prior good neighbor rulemakings for ozone, it was establishing uniform emissions control levels for all covered states, using a comparative analysis of the cost-effectiveness of different emissions control technologies as a key metric to establish the appropriate degree of stringency to define "significant contribution." 88 FR 36675–77, 36678–79, 36683, 36718–19, 36741. The EPA explained that it determined in the final Good Neighbor Plan it would require controls up to the $11,000/ton representative cost threshold identified for EGUs associated with retrofit of SCR post-combustion control technology and that non-EGU costs on a per ton basis were generally commensurate with this level of control stringency. 88 FR 36746–47. The EPA explained there could be variation in costs for particular units depending on their configurations or level of operation but that this variation did not impact its selection of the overall appropriate level of stringency. *Id.; id.* at 36740–41. The EPA explained it was not relying on the $7,500/ton preliminary threshold identified in the Non-EGU Screening

Assessment, recognizing costs were more heterogeneous than that single figure, and that nonetheless, the Screening Assessment adequately served its function of helping the EPA target the most impactful non-EGU emissions control strategies in defining "significant contribution." *Id.;* Good Neighbor Plan RTC at 113–15. The EPA explained that for EGUs, the trading program would allow for cost-efficient compliance planning for all sources and adjusted its proposed trading program "enhancements" to preserve greater flexibility for EGUs through the 2020s, *id.* at 36729–30, 36684, while for non-EGUs, the EPA made available flexibilities such as alternative emissions limits for any units facing excessively high costs or technical infeasibility, *id.* at 36818–19. The EPA explained that it believed its selected level of stringency as compared to prior transport rules was appropriate in light of the more protective 2015 ozone NAAQS and its projections of persistent elevated ozone levels. *Id.* at 36660. It explained how its analysis compared and was consistent with the determinations in the Revised CSAPR Update and other previous rulemakings taken pursuant to CAA section 110(a)(2)(D)(i)(I). 88 FR 36660; Good Neighbor Plan RTC at 37–39, 92–93. The EPA explained how it had derived its estimates of representative costs for both EGUs and non-EGUs, which accounted for a range of costs associated with retrofit of controls on existing sources. 88 FR 36720–31, 36738–40. The EPA explained how its selected level of control was also roughly commensurate with the level of control required of existing sources in downwind states. Good Neighbor Plan RTC at 62–63.

The EPA explained how it evaluated the air quality factor in its Step 3 analysis, viewing it as serving a confirmatory role that an appropriate level of emissions control stringency would be achieved overall, that (based on available information) no cost-effective strategies had been overlooked, and that if the identified cost-effective level of control stringency were applied uniformly across the linked upwind states, there would be, on average and in the aggregate, widespread reductions in ozone levels at downwind receptors. *Id.* at 36683, 36741, 36748–50.

The EPA explained that it generally focused on large stationary sources of $NO_X$ emissions in upwind states, consistent with the science of regional-scale ozone transport and all of its prior good neighbor rulemakings for ozone. *Id.* at 36660, 36671, 36719. The EPA explained it recognized that air quality improvement from any particular source

---

[23] *See* Wisconsin Paper Council's June 21, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0338, at 2.

[24] *See* Indiana Municipal Power Agency's June 20, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0361, at 9.

[25] *See* Lower Colorado River Authority's June 21, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0395, at 2 (footnotes omitted).

[26] *See* Wisconsin Paper Council's June 21, 2022, comment letter Docket Id No. EPA–HQ–OAR–2021–0668–0338, at 2.

or group of sources may appear relatively small, but this is simply an expression of the "collective contribution" problem that ozone presents. Good Neighbor Plan RTC at 98, 103–04. The EPA explained why, given this problem and the need to control many sources over a wide area, it makes sense to define obligations for each state subject to a FIP through the application of a uniform level of emissions control across the linked states and to regulate on an industry-by-industry basis across those states, as a matter of both efficiency and equity. 88 FR 36673, 36675–76, 36677, 36680, 36683, 36691, 36719, 36741; Good Neighbor Plan RTC at 8, 48, 56–58, 83, 92–93, 118.

The EPA explained that it considered boilers in several industries to be impactful and controllable non-EGU types and that boilers in the pulp and paper industry were among those sources with well-demonstrated, cost-effective $NO_X$-emissions control options. 88 FR 36681–82, 36736, 36739–40; Good Neighbor Plan RTC at 93, 97, 99–100, 107, 119–21. The EPA explained that it nevertheless not including non-EGU requirements for Wisconsin in the final rule because based on the updated modeling used for the final rule, Wisconsin was no longer projected to be linked to downwind receptors in the 2026 analytic year. *Id.* at 118.

The EPA addressed SNCR operating characteristics and effectiveness for existing EGUs, both in terms of optimizing SNCR controls that had already been installed, and in terms of installing new SNCRs on existing EGUs. 88 FR 36725–26. The EPA evaluated comments concerning SNCR performance where specifically raised, *see, e.g.,* Good Neighbor Plan RTC at 229. The EPA also gave consideration to certain EGUs that have widely varying operating levels because they serve a "peaking" function rather than supplying baseload power to the grid and did not include them in setting the stringency of the rule for EGUs at Step 3. 88 FR 36732.

## III. Analysis of Severability in Response to Comments

In this section, the EPA provides a fuller explanation why the Good Neighbor Plan can and should apply on a state-by-state basis for any state for which the EPA has a responsibility to promulgate a FIP, regardless of the number of states covered at any given time. Drawing together the Agency's legal and technical reasoning, based on the information and data available at the time, provided in the record when the

Good Neighbor Plan was signed and promulgated, the EPA provides a more thorough response to the relevant comments that together can be read to have raised that issue.

### A. Summary of Response

As the EPA stated in the final rule, the Good Neighbor Plan by design is severable by state. 88 FR 36693. The rule implements the statute's prohibition on "significant contribution" under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS by promulgating state-level FIPs that require the industries in each contributing upwind state to achieve at least minimum levels of emissions performance deemed to be cost-effective. *Id.* at 36741. So long as they meet that level of performance, the industries in any state regulated under the Good Neighbor Plan are understood to have lawfully addressed good neighbor obligations and eliminated that portion of a state's significant contribution to downwind air pollution. While the EPA must necessarily account for the multi-state nature of the interstate-ozone problem, consistent with the statute and case law, the Good Neighbor Plan imposes obligations on sources in each individual state that are appropriate for those sources and are achievable.

Those requirements result from the application of a longstanding analytical framework that the EPA has applied when evaluating interstate transport obligations for multiple prior ozone NAAQS. 88 FR 36660, 36668–69. Shaped through the years by input from state air agencies [27] and other stakeholders on the EPA's prior interstate transport rulemakings and SIP submission actions,[28] as well as court decisions, the EPA has developed and used a "4-step interstate transport framework" to evaluate states' obligations to eliminate interstate transport emissions under the interstate transport provision for each prior ozone NAAQS: (Step 1) identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and/or maintenance receptors); (Step 2) identify states that impact those air quality problems in other (*i.e.,* downwind) states sufficiently such that the states are considered to "contribute" (*i.e.,* are considered "linked") to those receptors and whose emissions therefore

warrant further review and analysis; (Step 3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind State's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (Step 4) adopt permanent and enforceable measures needed to achieve those emissions reductions. The EPA does not require states to use the 4-step interstate transport framework in good neighbor SIP submissions, nor has the EPA ever maintained that this is the *only* way states could satisfy their obligations under CAA section 110(a)(2)(D)(i)(I). However, it is a useful organizational tool and evaluation framework that comports with the statutory text and structure of the Act. The application of uniform levels of emissions control stringency at Step 3 across all linked states has been upheld by the Supreme Court as "permissible, workable, and equitable." *EPA* v. *EME Homer City Generation, L.P.,* 572 U.S. 489, 524 (2014). The Supreme Court there expressly rejected that the Act mandates a definition of "significance" that is directly proportional to each state's contribution, finding that reading "appears to work neither mathematically nor in practical application." *Id.* at 516. As the EPA explained in the Good Neighbor Plan, the 4-step interstate transport framework, including the application of uniform minimum control stringency, remains a particularly fair and equitable approach to apply in the case of a multistate pollution problem like ozone, characterized by "collective contribution" and in which widespread emissions reductions of a single precursor pollutant (nitrogen oxides or $NO_X$) over a wide geographic area are known to be effective in improving ozone levels downwind. 88 FR 36719.

Because the methodology for defining those obligations ultimately relies on a determination regarding what level of widely available emissions performance each type of regulated source can cost-effectively achieve, the obligations set for sources in each state are independent of the number of states included in the Good Neighbor Plan. Accordingly, the fact that obligations may be suspended or not yet operative with regard to some states does not impact the Good Neighbor Plan's conclusions as they apply in other states. Rather, as the EPA explained, the framework yields an "amount" of pollution for "each State" that the EPA is authorized to "prohibit," CAA section 110(a)(2)(D)(i), standing in the shoes of

---

[27] *See* 63 FR 57356, 57361 (October 27, 1998).

[28] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

a state, CAA section 110(c)(1), based on the amounts of pollution that would be avoided in that state by applying the control technologies the EPA determined were cost-effective for the covered industries. 88 FR 36675. The amounts to be prohibited are thus premised on reasonable levels of pollution control upwind rather than on a specific, aggregate quantum of ozone reduction that must be achieved downwind. *Michigan* v. *EPA,* 213 F.3d 663, 674–80 (D.C. Cir. 2000).

Under this framework, while the emissions-control requirements are uniform across the same types of sources in each state, the size of each state's total incremental emissions-reductions obligation under the Good Neighbor Plan, and the resulting improvement in air quality downwind, depends on the particular sources present in that state and the level of pollution reduction those sources are already achieving. 88 FR 36683. If a state's sources are already well-controlled, they will have less to do to meet the EPA's defined level of control stringency; if the state's sources are not already well-controlled, they will have to do more. But these state-specific obligations derive from the application of common, uniform levels of emissions control stringency calculated for each type of source based on the demonstrated performance of pollution control technologies that can be replicated in any linked upwind state. *EME Homer City,* 572 U.S. at 519–20. Calculating "significance" according to source type and concluding that the good neighbor provision can be reasonably implemented by bringing all covered sources up to a common level of control ensures the EPA can fairly administer the program in any state that becomes subject to a need for federal regulation, while avoiding inequities that could arise if state plans (and relevant sources) were addressed seriatim. *See* 88 FR 36749 (explaining the need to avoid a "which state goes first" problem). The achievement of that level of performance for any particular state is not dependent on the number of states in the Good Neighbor Plan, nor on the order in which the states are addressed. In this way, the Good Neighbor Plan prohibits each covered state's "significant contribution" to downwind ozone problems in a "permissible, workable, and equitable" manner. 572 U.S. at 524.

Given this statutory structure and regulatory framework, the Good Neighbor Plan is "modular" by nature, defining and implementing the obligations for each state.

First, in line with the statutory text, structure, and case law, the EPA determines the "significant contribution" that must be prohibited at the individual state level. *See* 88 FR 36687 (citing *North Carolina* v. *EPA,* 531 F.3d 896, 906–08, 921 (D.C. Cir. 2008)). None of the steps in the 4-step interstate transport framework differ based on the number of states included in the Good Neighbor Plan. For example, the control technologies and cost-effectiveness figures the EPA considers at Step 3 do not depend on the number of states included. Instead, the Good Neighbor Plan regulates certain relatively large emitting sources in each included state (including both new and existing sources meeting the relevant criteria), up to a uniform level of pollution control that is common across sources of that type in all potentially contributing states. Once the "amount" of pollution for each state is determined, whether the 4-step interstate transport framework is applied to one state or fifty, it would yield the same emissions control obligations for the included states. That means that when the number of states whose sources are included in the Good Neighbor Plan's regulatory programs for EGUs or non-EGUs changes from the number included at promulgation, which is historically common in interstate transport rules and consistent with states' authority under the Act to replace federal plans with state plans, the emissions reduction obligations of the states remaining in the Good Neighbor Plan's programs stay the same, and the obligations of states joining the Good Neighbor Plan's programs are the same as those that were applied to the states already included.

Second, given the state-specific statutory mandate, for those components of the Good Neighbor Plan that necessitate consideration of multi-state effects, the EPA is careful to avoid creating any interdependency among the particular states included, both in the Agency's analytical methodology and in the Good Neighbor Plan's regulatory requirements. As the EPA explained in the rule, interstate ozone pollution continues to present a "collective contribution" challenge wherein many sources of emissions over a wide geographic area comprise a substantial portion of the ozone problems downwind. 88 FR 36678, 36712. Where the EPA is called upon to fill a gap in state planning efforts, it must therefore develop solutions for the relevant state(s) that reasonably account for the efforts other states may undertake, even in the face of

uncertainty concerning what those states may do. *Id.* at 36695–96. For example, when evaluating the Good Neighbor Plan to ensure it did not "overcontrol" (*i.e.,* yield more reductions than necessary), the EPA did not just look at the states included in the original Good Neighbor Plan, but also looked at all of the other states the modeling showed were potentially affecting downwind air quality above the "contribution" threshold (as well as each receptor's "home" state), even if those states were not included in the Good Neighbor Plan.[29] *See infra* note 47 supra and accompanying text (providing record citations). Taking this broad view, the EPA found that even making all cost-effective reductions available in all linked upwind states, and assuming equivalent emissions reductions from the two downwind states not included in the Good Neighbor Plan, the rule would not constitute overcontrol. 88 FR 36749–50. Accordingly, because the overcontrol analysis already assumes the emissions reductions that can reasonably be anticipated from the implementation of the good neighbor provision for a given NAAQS, requiring available emissions reductions in any subset of those states does not constitute overcontrol of those upwind states. *See* section III.B.2.c. of this document (providing record citations). Finally, the Good Neighbor Plan's regulatory requirements, including the emissions trading program for power plants, are designed to be fully implementable in each individual state and do not depend on participation from a minimum number of states. *See* section III.B.3. of this document (providing record citations). In these ways, the EPA's methodological approach to devising good neighbor FIPs for ozone ensures against inter-dependency among states, through accounting for the effects of emissions reductions within a web of "overlapping and interwoven" linkages among many states, *EME Homer City,* 572 U.S. at 496–97, while at the same time setting technology-based emissions limits and other control measures that the sources in each state can meet. 88 FR 36741, 36749.

Third, while equity and consistency in obligations among states are at the core of the statute and the EPA's 4-step interstate transport framework, the suspension or removal of the Good Neighbor Plan's requirements in some states does not provide a lawful basis to suspend them in others. Just as each state has an individual obligation to

---

[29] These states are now included in a supplemental rulemaking to address their obligations. *See supra* note 19.

satisfy the good neighbor requirements of CAA section 110(a)(2)(D), regardless of whether other states have done so, the EPA has a statutory obligation to address the good neighbor obligations of "each State" where it has a federal responsibility to act. CAA section 110(c)(1). Indeed, the goals of equity and consistency extend to the downwind states for whom the good neighbor provision was enacted. The good neighbor provision's requirement of consistency with the rest of the CAA, *see* CAA section 110(a)(2)(D)(i), including the air quality attainment schedules that are the "heart" of the Act, *Train* v. *NRDC,* 421 U.S. 60, 66 (1975), means that each downwind state with identified air quality problems has a statutory right to timely relief from the public health and regulatory burdens of upwind pollution. *See* 88 FR 36694 (discussing case law). It would be contrary to this statutory purpose to revise or suspend the Good Neighbor Plan as to upwind states for which the EPA is under a statutory requirement to act because the Good Neighbor Plan's requirements were suspended for other states.

These principles are applicable in a variety of circumstances where the EPA may approve a state's SIP as sufficiently meeting its good neighbor obligations even if the state's approach is different than the EPA's approach, for that state or for other states. The EPA's interstate ozone transport actions are typically taken on a national basis and with the goal of ensuring consistency, including in terms of alignment of the timing of obligations, because doing so ensures equitable treatment of all states and is administratively efficient given the commonality in analysis and obligations across many states, particularly in the case of interstate ozone transport. In addition, the establishment of interstate emissions trading programs has allowed for more cost-efficient compliance activities, and it is far more efficient to establish these programs through a consolidated, multistate rulemaking action. Historically, this has also been coupled with the EPA's practice of seeking consolidated judicial review of such actions in the D.C. Circuit to ensure that a consistent caselaw regime applies across the entire country on matters of interstate ozone pollution and is not varied by which federal judicial circuit a state happens to be located in. 88 FR 36859–60.[30]

Nonetheless, the EPA acknowledged states' ability to develop alternative, potentially approvable approaches to meeting their good neighbor obligations. *See* 88 FR 36838–43. In evaluating alternative approaches, the EPA must consider interstate consistency, 88 FR 36839–40; *id.* n.405; 87 FR 9338, 9380–81, but it has never been the Agency's view that its methodology for defining one state's obligations would have to be redone simply because it found an approach in another state also approvable.

Thus, as explained in more detail in section III.B., the comments asserting that the EPA should stay, revise, or withdraw the Good Neighbor Plan for any particular state depending on the status of implementation of good neighbor obligations of other upwind states cannot be squared with the state-specific mandate of the Act, nor would this be compelled as a result of any element of the EPA's 4-step interstate transport framework. For those states where the Good Neighbor Plan may be currently suspended, good neighbor obligations will ultimately be met, either through an approved state plan or a federal plan as necessary. Meanwhile, sources in upwind states regulated by the Good Neighbor Plan would be under the same legal obligation to control their pollution even if the EPA developed a federal plan containing just those states or some subset of them or separate federal plans for each state.

*B. Step-by-Step Review of the 4-Step Interstate Transport Framework*

A review of the EPA's methodology demonstrates why each upwind state would bear the same emissions reduction obligations, regardless of how many states were included in a particular rulemaking. The EPA's method for defining good neighbor obligations, while applied consistently across the nation and respectful of the multistate "collective contribution" nature of the interstate ozone problem, produces a definition of "significant contribution"[31] for the sources in each individual state, and provides for the prohibition of such emissions in a manner that is not dependent on the inclusion of any particular number or grouping of states. As tested and refined

through case law over the past quarter-century, the EPA's methodology is consistent with the state-specific structure of the Act and the fundamental statutory obligation to define and prohibit each state's own significant contribution. *See* CAA section 110(a)(1) and 110(a)(2)(D); *Wisconsin* v. *EPA,* 938 F.3d 303, 324–25 (D.C. Cir. 2019); *North Carolina,* 531 F.3d at 906–08, 920–21.

Consistent with the statutory text and structure and judicial precedent, the EPA's 4-step interstate transport framework was designed to be independent of the number or scope of included states. Because the statute allows states to replace a FIP with a SIP—and because as a practical matter the EPA does not necessarily receive or act on each state's SIP submission at the same time—the Good Neighbor Plan is expressly designed to allow states to be added to or removed from the federal emissions control program over time, as circumstances require (including where a state submits an approvable SIP to replace their FIP, *see* 88 FR 36838–39). The Good Neighbor Plan does so primarily by setting good neighbor obligations based on the available, cost-effective technologies that can be applied to each type of high-emitting source—a technology-focused definition of "significant contribution" that the Supreme Court upheld in *EME Homer City* and that can be evenhandedly applied to existing sources and those that may be newly located in any contributing State in the future. 88 FR 36675–77, 36678–79, 36683, 36718–19, 36741. This ensures fairness and consistency across all states when the EPA must act pursuant to its FIP authority to implement CAA section 110(a)(2)(D)(i)(I), regardless of when any particular state is addressed—it avoids the problem of "which state goes first"; that is, it avoids producing unfairly varying levels of emissions-control stringency depending on the order in which states' obligations are addressed. 88 FR 36749. As the Supreme Court aptly illustrated in *EME Homer City,* where multiple states contribute to multiple other states (as remains the case across the contiguous U.S. for the 2015 ozone NAAQS), addressing each state's obligations in proportion to its contribution to each receptor in seriatim fashion becomes mathematically unworkable and economically inefficient. 572 U.S. at 516. The EPA's approach to developing ozone good neighbor FIPs avoids these pitfalls, avoids interdependence, and avoids unfairness—it works for each state that may need federal regulation of its

---

[30] *See also, e.g.,* 86 FR 23054, 23163–64 (April 30, 2021); 84 FR 56058, 56093 (October 18, 2019); 83 FR 65878, 65923–24 (December 21, 2018); 83 FR 50444, 50472 (October 5, 2018); 81 FR 74504, 74585–86 (October 26, 2016); 76 FR 80760, 80773–74 (December 27, 2011); 76 FR 48208, 48352

(August 8, 2011); 71 FR 25328, 25329 (April 28, 2006); 70 FR 25162, 25316 (May 12, 2005); 65 FR 2674, 2725 (January 18, 2000); 63 FR 57356, 57480 (October 27, 1998).

[31] "Significant contribution" is often used as a shorthand to refer to the identification of those amounts of emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states and therefore must be prohibited under the good neighbor provision. *See* CAA section 110(a)(2)(D)(i)(I).

sources. Accordingly, under each step of the 4-step interstate transport framework discussed further later, a change in the number of states covered does not impact the obligations of the states or sources that remain covered.

1. Steps 1 and 2

The EPA identifies receptors based on nationwide modeling and monitoring data and evaluates each state's contribution to receptors in downwind states on an individual-state basis to identify upwind-state-to-downwind-state linkages. The air quality modeling and the monitoring data the EPA considered for Steps 1 and 2 cover the contiguous United States. *See* 88 FR 36696.

At Step 1, the EPA identified downwind receptors that are expected to have problems attaining or maintaining the NAAQS. For a detailed explanation of what receptors are and how the EPA identified them, *see* 88 FR 36703–08. At Step 2, the EPA identified which upwind states contribute to the identified receptors in amounts that would be sufficient in the EPA's interpretation of "contribution" to "link" the individual upwind states to downwind air quality problems. For a detailed explanation of how the EPA identified these linkages, *see* 88 FR 36708–12.

The nationwide identification of receptors expected to have problems attaining or maintaining the NAAQS and of states "contributing" to those receptors does not rely upon nor necessarily dictate the number of states included in a particular rulemaking. The EPA historically has applied a common numerical threshold for determining which states "contribute" to downwind air quality problems, and the contributions from each state are evaluated independently with respect to this threshold. 88 FR 36677–78. The modeling of baseline conditions did not contain or rely on the emissions reductions in the Good Neighbor Plan, and the monitoring data were based on measurements during years prior to when the Good Neighbor Plan was final and thus these data do not reflect the impacts of emissions reductions from the Good Neighbor Plan.[32] This approach creates a level playing field

from which to assess each state's level of contribution. 88 FR 36713.

In addition to promoting national consistency, the EPA has explained that using a single contribution threshold avoids creating potential inter-dependencies among states. When the EPA had previously considered whether to approve individual states' use of a higher contribution threshold, it had proposed (for the State of Iowa) to consider the effects of other states' efforts to reduce their pollution at shared receptors. *See* 88 FR 36715. On further consideration, however, the EPA found this would have introduced an interdependency. *Id.* When the EPA gave consideration to this approach in its SIP Disapproval action disapproving 21 state implementation plans (88 FR 9336; February 13, 2023), in response to comments, it explained that this factor would inappropriately introduce an inequity in which some states could evade obligations through reliance on the incidental effects of other states' efforts.[33] *See also* 88 FR at 36713 (explaining that "use of alternative thresholds would allow certain states to avoid further evaluation of potential emissions controls while other states must proceed to a Step 3 analysis. This could create significant equity and consistency problems among states.").

The EPA's analytical methodology at Steps 1 and 2 ensures the EPA can impose FIP obligations, where they may be needed, according to a common rubric that maintains equity and consistency between the potentially subject states. Thus, the analytic methods in both Step 1 and Step 2 to determine "contributing" states rely on emissions and air quality data that are independent of which or how many states are covered by the Good Neighbor Plan.

We note that comments from ASC and PCA in Comment Category 2 summarized in section II.B. of this document contained several statements the meaning of which the EPA could not clearly ascertain. Those comments said the EPA's Step 2 screening analysis included states that "already had Good Neighbor SIPs for the 2015 ozone NAAQS." *See* ASC Comment Letter at 13. The meaning of this statement is unclear. States may have made SIP *submissions* for these obligations, but at the time of this comment, the EPA had not approved all of those submissions and was in the process of disapproving many of them, and so the statement read

that way (*i.e.,* to suggest that the States already had approved SIPs) is factually incorrect.[34] The sentence in the ASC comment letter goes on to state that the EPA "prematurely disapproved" these SIPs, but the disapprovals had only been *proposed* at the time the comment was submitted. The commenter did not explain what made the EPA's proposed disapprovals "premature."

This comment might be read as in relation to the previous approvals of SIPs for certain states, and thus an argument that these states' emissions should be excluded from modeling analyses. Or the comment might be read in relation to a subsequent statement in the comment, that states should not be included in the Good Neighbor Plan's "screening" at Step 2 if final action on the SIP submission had not yet been taken. In either of these cases, the comment would be misplaced, in that our analysis of the Steps 1 and 2 modeling looks at the transport of pollution as a factual matter and does not remove from consideration the emissions of states based on the procedural status of their SIP submissions. In addition, as explained in section III.B.1., the EPA's baseline air quality and contribution modeling for Steps 1 and 2 is conducted for a modeling domain that includes the entire contiguous United States and accounts for all emissions sources. 88 FR 36696. Removing emissions from certain states from this modeling would produce erroneous, unrealistic, and counterfactual results.

These comments also stated that the EPA may need to conduct a new analysis at Step 2 in the event the EPA takes a different action on those SIPs than contemplated in the proposed Good Neighbor Plan. In that case, according to commenter, the EPA "would need to conduct a new assessment and modeling of contribution and subject those findings to public comment." ASC Comment Letter at 14. On the one hand, the EPA agrees with the commenter to the extent they are suggesting that if updated modeling the EPA conducted (*e.g.,* the 2016v3 modeling used in the final Good Neighbor Plan) showed a state was no longer contributing at Step 2, and the

---

[32] Both the EPA and States can use air quality modeling and monitoring information on ozone concentrations and contribution levels to make individual determinations for each state concerning whether it is contributing to any out-of-state receptors. *See, e.g.,* 88 FR 9365 n.286 (identifying individualized approvals of SIPs using modeling at Steps 1 and 2).

[33] *See* 2015 Ozone NAAQS Interstate Transport SIP Disapprovals—Response to Comments (RTC) Document at 296, available at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0663-0083.*

[34] The commenter also asserted that the EPA had "proposed" findings of failure to submit for four states, New Mexico, Pennsylvania, Utah, and Virginia. That statement was incorrect insofar as the EPA issued a *final* finding of failure to submit for these states in December of 2019, effective January 6, 2020, had an obligation to promulgate FIPs for these states pursuant to CAA section 110(c)(1) by January 6, 2022, and was subject to a consent decree deadline to promulgate FIPs for these states (excluding New Mexico) by March 15, 2023. *See* 88 FR 36689 n.106.

EPA approved that state's SIP submission or had deferred taking action, then the EPA would not promulgate a FIP for that state given that disapproval (or a finding of failure to submit) is a necessary predicate to FIP authority. This is precisely how the EPA proceeded in the final SIP Disapproval and Good Neighbor Plan and in taking subsequent rulemaking actions for states where its final analysis at Steps 1 and 2 had materially changed from its proposed SIP and FIP actions. *See* 88 FR 36656, 36658, 36689; *see also* SIP Disapproval, 88 FR 9354.[35] On the other hand, the comment might be read to suggest that if the EPA's analysis changed for any particular state at Steps 1 or 2, then it would have to conduct a whole new analysis of every other state at Steps 1 or 2. If so, that comment is in error because the EPA's baseline air quality and contribution analysis at Steps 1 and 2 already accounts for emissions across all states regardless of their inclusion in the rule, and the results of that analysis would not change for one state simply because the results indicated that another state had fallen below the Step 2 contribution threshold.

Taken as a whole, this set of comments appears to be primarily about the need for the EPA to ensure consistency in how it analyzed each state's obligations between the separate SIP and FIP rulemakings (a consistency that the EPA agrees is important and abided by). The commenter did not state that the EPA's analysis must be redone if for reasons beyond the Agency's control the Good Neighbor Plan were stayed or not in effect for any particular state; rather, the commenter emphasized the need for consistency in the EPA's own, substantive analytical determinations. If the commenter intended to argue that a change in analysis at Steps 1 or 2 for one state would necessarily alter the EPA's substantive assessment for other states and would need to be subjected to additional notice and comment, the commenter did not state that, nor provide a theory or reasoning as to why that would be the case, and for the reasons explained in this section (III.B.1.), such an assertion would reflect a misunderstanding of how baseline air quality and contribution analysis is conducted at Steps 1 and 2.

## 2. Step 3

The Act requires each state to eliminate its "significant contribution" to downwind nonattainment or interference with maintenance of air

quality standards. To determine which emissions from contributing states are "significant" at Step 3, the EPA analyzes available emissions control strategies and their costs. Based on that analysis, the EPA then identifies a uniform degree of emissions control stringency that is reasonable to require from upwind sources, calculated based on the emissions performance those sources would achieve through the application of the technologies the EPA found were most cost-effective. Step 3 is a multi-factor analysis, with its primary focus on technology availability and associated cost, the level of emissions reductions that are thereby achieved, and the associated air quality benefits delivered to downwind receptors. The approach applies uniform levels of emissions control stringency across all upwind states, with the objective of bringing the covered sources in each state up to a minimum level of emissions performance to reduce ozone-precursor emissions. *See* 88 FR 36675–77, 36678–79, 36683, 36718–19, 36741. This approach is tailored to a pollution problem characterized by collective contribution from many similar sources all emitting a similar precursor pollutant ($NO_X$) over a wide geographic area; it ensures an efficient and equitable solution that avoids interdependency. *Id.* at 36719, 36741, 36749.

Thus, when the EPA uses the term "uniform" in the context of Step 3, it is not referring to the division of a specific "pie" of air pollution, total emissions, or total cost divided proportionally among the upwind states; rather it is referring to application of a pollution technology applied equally across all applicable units of a common size and type. 88 FR at 36746–47. One example of a uniform control stringency level is the assumption that all EGU units with already-installed selective catalytic reduction (SCR) technology operate and optimize the performance of these controls. *Id.* at 36720–21. The EPA estimated that this would be realized through emissions rates (on average across the fleet) of 0.08 pounds per million British thermal units at costs of about $1,600 per ton of NOx removed. *Id.* The translation of this technology stringency into the definition of significant contribution is specific to each state's unique group of sources and the operating characteristics of the affected units at those sources. *Id.* at 36683. In no way is the amount of emissions mitigation required of sources in each state interdependent on another state's mitigation responsibility. The "amount" of pollution that is identified

for elimination at Step 3 of the 4-step interstate transport framework is therefore that amount of emissions that is above the level of emissions remaining after the cost-effective emissions control strategies are implemented. *Id.* at 36676. Because it is possible that a uniform level of stringency may produce more emissions reductions than is necessary to fully resolve a particular upwind state's linkages to all downwind receptors, the EPA tests its identified level of stringency for "overcontrol." For a detailed explanation of how the EPA applies Step 3, *see* 88 FR 36718–54.

Acknowledging that some of the factors considered in the Step 3 analysis are considered at a national scale while certain components of that analysis account for state-level or linkage-specific data, the EPA here explains in more detail why the selected levels of control stringency for particular industries, and therefore the particular obligations of individual states, do not vary depending on the number of states subject to FIPs under the Good Neighbor Plan.

The EPA identified potential levels of emissions control stringency that could be applied for each industry, and thus for the set of sources found in each state, regardless of the number of States covered by an approved SIP or a FIP or not yet covered by either. In evaluating those potential levels of stringency, the EPA conducted a wide-ranging survey of emissions control technologies (and associated cost data) used throughout the United States and even internationally. Then, the EPA conducted the air-quality-improvement and overcontrol analyses considering the effects of the potential uniform stringency levels at each identified receptor. The primary way in which the EPA conducts that assessment is to apply the potential stringency levels across all of the states linked to each particular receptor as well as the downwind, "home" state for that receptor. The EPA then assesses the average resulting improvements across all receptors as well as tabulates the aggregate effects. This allowed the EPA to ascertain whether a selected level of stringency was effective at achieving improvements in the air quality downwind that were reasonable in relation to the identified costs, while also ensuring a selected stringency level is not more stringent than necessary to bring any given receptor into attainment. 88 FR 36741, 36749–50. But given the overlapping linkages among multiple upwind and downwind states, as well as varying levels of baseline emissions control in each state, further

complicated by the year-to-year variability in ozone levels due to meteorology, *id.* at 36750, the EPA's methodology, going back to the original NO$_X$ SIP Call in 1998, has never attempted to pinpoint a precise level of emissions control for each state that maximizes cost-effectiveness in relation to each specific linkage. *See* 88 FR 36748 (finding the aggregate and average air quality effects of the combined EGU and non-EGU strategies across all receptors would achieve "meaningful downwind air quality improvements").

Expressed in simpler terms, the EPA's long-standing interpretation of CAA section 110(a)(2)(D)(i)(I)—an approach that the Supreme Court expressly upheld in *EME Homer City*—is that a state may satisfy its good neighbor obligations by ensuring that its emissions do not exceed what would result from the application of cost-effective emissions controls. The purpose of Step 3 is to identify a set of widely available and well-established, cost-effective emissions controls that can be applied in any upwind state, while checking to ensure that those emissions controls will achieve downwind improvements in air quality without overcontrol.

As described in more detail in sections III.B.2.a.–III.B.2.c., none of the determinations that underlie Step 3 are contingent on a particular state or set of states being covered by the Good Neighbor Plan. Accordingly, the EPA's Step 3 analysis can be extended to states not covered by the Good Neighbor Plan either because the state is covered by an approved SIP or prior FIP or because the EPA has not yet taken action to review a SIP or impose a FIP. By identifying cost-effective approaches to reducing multi-state ozone pollution in a manner that does not depend on the participation of any particular state or set of states, the EPA's approach reasonably fulfills Congress's direction in CAA section 110(a)(2)(D)(i)(I) to address the multi-state ozone problem in a way that defines each state's obligations on an individualized basis.[36]

Specifically, the EPA took the following steps in conducting its Step 3 analysis in the Good Neighbor Plan:

a. Technology, Cost, and Emissions Reduction Analyses

The EPA's analysis started by examining emissions control technologies (sometimes also referred to as "strategies") and their associated costs and emissions reductions. The Good Neighbor Plan identified conventional, at-the-source, NO$_X$ emissions control technologies that have been available in the covered industries for many years. *See, e.g.,* 88 FR 36738 (identifying control technologies for EGUs); *id.* at 36739 (identifying control technologies for non-EGUs). These analyses were not specific to the particular group of upwind states whose inclusion the EPA had proposed or finalized in the Good Neighbor Plan but looked instead at demonstrated technologies and associated estimated costs across each industry and technology type as a whole, without any geographic limitation. The EPA reasonably considered a wide range of technology and cost information (including information from examples and technical literature throughout the U.S. or even internationally) rather than just the data available in any particular state or regional grouping, since this allows for a more comprehensive assessment of the technologies available and associated costs for each source type.[37]

For EGUs, the EPA conducted an inquiry nearly identical to prior good neighbor rules, looking at several widely available and well-understood NO$_X$ control strategies that can be and have been applied to EGUs for decades throughout the United States. *See* 88 FR 36720. For non-EGUs, the EPA similarly consulted a wide range of sources of information, starting with national

databases like the National Emissions Inventory and the Control Measures Database (CMDB), and proceeding from there to additional national and international technical literature, as well as a variety of existing state and federal NO$_X$ control requirements. *See id.* at 36732–33; *see generally* Non-EGU Sectors Final Rule Technical Support Document (TSD);[38] EGU NO$_X$ Mitigation Strategies Final Rule TSD.[39] These included trade association literature; academic studies; multi-state regional organization publications; state rules and publications; contractor studies; EPA rules, publications, and databases like the RACT/BACT/LAER Clearinghouse; European Commission publications; operating permits; and data on what emissions limits specific facilities or companies were achieving. *See, e.g.,* Non-EGU Sectors Final Rule TSD at 9–11 (reciprocating internal combustion engines (RICE)), 27–29 (cement kilns), 35–39 (reheat furnaces), 42–43, 45–47 (glass furnaces), 62–65, 68–84 (boilers), 92–94 (Municipal Waste Combustors (MWCs)).

The EPA derived estimated "representative" costs for particular control strategies for EGUs through a wide-ranging analysis of the likely costs associated with capital, material, equipment, and labor. *See generally* EGU NO$_X$ Mitigation Strategies Final Rule TSD. The EPA derived its cost estimates for non-EGUs primarily from the CMDB, which contains a compilation of a variety of sources of technical literature and examples.[40] The "representative" costs that the EPA identified for different levels of control stringency and for different industries were derived from this nationwide analysis and were not specific to the particular states included in the proposed or final Good Neighbor Plan. *See* 88 FR 36727 (explaining derivation of $11,000/ton estimate). The EPA reasonably considered a wider range of cost information than the data that might be available in any particular state since it allows for a more comprehensive assessment of the costs each source type might be expected to

---

[36] Just as the EPA's analytical approach allows for it to develop a good neighbor FIP for any state that may require one that reasonably establishes emissions control obligations in the face of uncertainty regarding what other states will do, it also allows states themselves to conduct a similar analysis of their own obligations in the context of developing a SIP without definitive knowledge of what other states will do to fulfill their own obligations. At Step 3 of the EPA's 4-step interstate transport framework, each state found to be contributing to one or more receptors can conduct an analysis of emissions control technologies or measures that would be cost-effective within the state. If each state linked to a given receptor (and the downwind state where that receptor is located, to account for that state's own fair share), made

[37] In response to comments, the EPA conducted a sensitivity analysis for EGUs to see if looking at control costs on a regional basis would change the results and found that it would not. EGU NO$_X$ Mitigation Strategies Final Rule TSD at 49–50. The fact that the EPA conducted this as a sensitivity analysis to address a comment further illustrates that the primary technology and cost analysis the EPA conducted, as described earlier, was not limited to a 23-state geography and would not be altered if that geography were different.

pollution-control efforts at these levels, a state could demonstrate that ozone levels at the downwind receptors would be measurably improved (without undertaking more emissions reductions than necessary). In the context of a FIP, this approach to evaluating air quality improvements at downwind receptors is necessary, because to avoid overcontrol, the EPA must consider whether applying a given control stringency level to other states would achieve more emissions reductions than necessary to bring a receptor into attainment.

[38] Available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1110.*

[39] Available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1092.*

[40] *See* Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, Assumed Control Technologies for Meeting the Final Emissions Limits, and Estimated Emissions Units, Emissions Reductions, and Costs at 5–7 (Non-EGU Memorandum), available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0956.*

face.[41] While the EPA provided for more individualized consideration of the costs particular facilities might bear and made available alternative emissions limits through its implementing regulations that could be justified on the basis of excessive cost, *see* 88 FR 36818–19, the EPA explained that cost in the Step 3 analysis "is not intended to represent the maximum cost any facility may need to expend but is rather intended to be a representative figure for evaluating technologies to allow for a relative comparison between different levels of control stringency." 88 FR 36740.

The EPA also used its technology analysis to calculate the anticipated emissions reductions that could be achieved if those strategies were applied to the population of sources in each state potentially contributing to at least one downwind receptor. 88 FR 36737–40. At this stage of the analysis, the EPA's assessment of the emissions reductions expected from particular control strategies under consideration again did not depend on the number or identity of the states included in the Good Neighbor Plan rulemaking itself. Rather, these estimates provided the inputs by which air quality benefits and overcontrol could then be assessed in the next stages of the Step 3 analysis (discussed next).

b. Air Quality Benefits

After compiling the data on available technologies, their relative cost-per-ton, and the expected emissions reductions that would result from each state, the EPA's Step 3 methodology then proceeded to evaluate the effect those emissions control strategies would have on downwind ozone levels. 88 FR 36741–42. This component of the EPA's analysis looked at the incremental ozone improvement that would be accomplished at each receptor from the reductions accruing from the upwind states linked to that particular receptor (whether included in a particular rule or not) at each of the assessed stringency levels. The analysis of air quality improvement as the EPA has conducted it (in the Good Neighbor Plan and in the prior CSAPR rulemakings) displays the improvements that are incremental to an uneven baseline in which states have

imposed differing levels of control stringency. Another way to think about the level of air quality benefit achieved would be to assume an uncontrolled baseline across all states and then apply the different levels of control stringency that were evaluated. This would illustrate far higher levels of air quality benefit as the uniform stringency levels are increased but would not credit the achievements in emissions control that some states have already adopted compared to others.

To calculate air quality change for any given upwind state-receptor linkage, the relevant group of states assumed to make comparable emissions reductions will vary, and in the EPA's primary method of analysis, it does not matter whether the other upwind states or the downwind state are in fact subject to the same emissions control requirements. Rather the purpose of the analytical exercise is to isolate, for comparative purposes, the effects of the potential stringency levels just to the states that are linked to a receptor while also assuming that the "home" state undertakes an equivalent level of stringency with respect to its own sources. *See* 88 FR 36742, 36748–50. Thus, the total number of states where the EPA has assumed emissions control stringencies as part of its Step 3 air quality assessment for purposes of the Good Neighbor Plan is 30 states. That is, the total of the 23 states included in the Good Neighbor Plan, the five other states that the EPA's analysis identified as potentially or likely to be linked at Step 2, plus, for their own receptors, Colorado and Connecticut as home states, even though they are not linked to other states' receptors.

The EPA's conclusions in the Good Neighbor Plan did not depend on a particular improvement at each individual receptor, but rather on an assessment that there would be widespread improvement in ozone levels across receptors in the aggregate and on average when the selected level of control stringency is applied uniformly across upwind states. *See* 88 FR 36742–43, 36747–48. In the Good Neighbor Plan, as relevant metrics, the EPA displayed how ozone levels would be expected to change at each receptor, what the average effect of the potential stringency levels would be across all receptors, and what the aggregated effect of the potential stringency levels would be across all receptors. *Id.* at 36742–43, 36747–48. This analytical exercise allowed the EPA to evaluate what level of stringency was appropriate in terms of delivering an acceptable level of air quality benefit to downwind receptors considering associated costs.

The role of the air-quality factor in the Good Neighbor Plan is essentially no different than in CSAPR. 88 FR 36678. The CSAPR analysis was conducted on a nationwide scale and focused on cost-breakpoints of different technologies, while also accounting for multiple factors other than a singular "knee-in-the-curve;" CSAPR looked holistically at both the "pattern" of linkages and the "average" air quality benefits that could be realized at representative cost/ton thresholds if those technologies were applied uniformly; CSAPR selected stringency levels that appeared to deliver the greatest air quality improvement on average, not state- or linkage-specific. *See id.;* 76 FR 48255–59. Likewise, in the Good Neighbor Plan, the Agency focused on mandating those NO$_X$ reduction strategies across contributing states that were found to be relatively widely-adopted and cost-effective on a per-ton basis, with the understanding that if these strategies were implemented uniformly across the upwind-state region, widespread air quality improvement would be achieved—without tethering that conclusion to some precise knee-in-the-curve specific to each linkage or receptor. *See* 88 FR 36741.

Commenters allege that this analysis necessarily depends on the specific group of states for which it is conducted, since different groups of states would have different sets of sources, with varying levels of emissions control already installed, and the application of emissions control strategies will have varying effects on downwind air quality. Effectively, these commenters seem to assert, for its methodology to function on an individual basis for each state, the EPA must determine for each state what level of emissions control applied only to its own sources would maximize cost-effectiveness relative to reducing ozone levels at a given downwind receptor. Under this theory, if the EPA conducted such an analysis, the appropriate level of stringency would vary for any particular state from what the EPA determined was appropriate in the Good Neighbor Plan on a uniform basis across states—and perhaps a lesser degree of stringency would be warranted for particular states.

Fundamentally, these comments misapprehend the role of air quality improvement in the EPA's Step 3 analysis and are, in effect, at odds with the EPA's historical approach that the Supreme Court's opinion in *EME Homer City* upheld, *i.e.,* the use of uniform control stringency (using cost as a proxy for technology type and compliance burden) to allocate responsibility across

---

[41] In response to comments, the EPA conducted a sensitivity analysis for EGUs to see if looking at control costs on a regional basis would change the results and found that it would not. EGU NO$_X$ Mitigation Strategies Final Rule TSD at 49–50. The fact that the EPA conducted this as a sensitivity analysis to address a comment further illustrates that the primary technology and cost analysis the EPA conducted, as described in section III.B.2.a., was not limited to a 23-state geography and would not be altered if that geography were different.

multiple upwind states despite varying effects of that stringency to downwind receptors. 572 U.S. at 518–19. Consistent with the same statutory interpretation and methodology the EPA has applied throughout each of its prior good neighbor rulemakings for ozone, the Good Neighbor Plan is not premised on accomplishing a precise, aggregate air quality result at each receptor, such that the omission of some states (even if they were legally exempted from obligations rather than simply under a temporary stay order or did not yet have their obligations addressed through a SIP or FIP) would increase the "share" of the problem that must be addressed by the remaining states. Rather, the Good Neighbor Plan holds the industries in each contributing upwind state subject to a federal plan to a uniform, minimum level of emissions performance deemed to be cost-effective. So long as they meet that level of performance, the industries in any state regulated under the Good Neighbor Plan are understood to have lawfully addressed good neighbor obligations and eliminated that portion of a state's significant contribution to downwind air pollution.

Even though this methodology does not purport to achieve attainment at all downwind receptors, it is consistent with the EPA's and the courts' understanding of the good neighbor provision. Under that provision, it is not upwind states' responsibility to ensure that downwind states are brought into attainment; each state must only eliminate its own significant contribution to nonattainment or interference with maintenance of the NAAQS in other states. CAA section 110(a)(2)(D)(i)(I). In reviewing the division of responsibility under this contribution standard, courts have upheld the EPA's approach as a reasonable way to allocate good neighbor obligations among multiple states for regional-scale pollutants like ozone, even though the air quality benefits resulting from a particular degree of control stringency will necessarily vary by state and receptor. This variation in effect is the consequence of an approach that respects several well-understood characteristics of the interstate ozone problem: the "overlapping and interwoven linkages between upwind and downwind States," "the vagaries of the wind" (i.e., the variability in meteorological conditions that makes precise ozone projections impossible), and the wide variation in the degree of baseline levels of emissions control that different states have already achieved.

*EME Homer City,* 572 U.S. at 496–97, 519–20; *see also Wisconsin,* 938 F.3d at 322; *Michigan,* 213 F.3d at 679–80. Commenters may believe that the EPA could at least establish different levels of cost-effective control stringency for each group of states linked to a particular receptor, rather than considering air quality improvement in the aggregate across all receptors—*i.e.,* to pick a knee in the curve that is specific to each particular receptor. Setting aside the problem of meteorological variability, this still presents the same problem the EPA faced in CSAPR, as recognized in *EME Homer City:* each set of states for one receptor has overlap with a different set of states for a different receptor.[42] Thus, for any given state, there cannot mathematically be a single, "correct" "knee-in-the-curve" that defines a maximally cost-effective stringency. *EME Homer City,* 572 U.S. at 514–18. Thus, as was the case in CSAPR, an approach that requires high-emitting sources in each state to come up to a uniform level of cost-effective emissions control, so long as it does not overcontrol, functions as a reasonable definition of each covered state's "significant contribution," and fulfills those covered upwind states' legal obligations under the good neighbor provision. 88 FR 36675–76, 36741.

Both the Supreme Court and the D.C. Circuit have recognized that variation in what a good neighbor rule will achieve at any particular receptor is a logical consequence of defining "significance" through identifying a uniform level of emissions control based on cost-effectiveness. As the Supreme Court explained in *EME Homer City,* "by imposing uniform cost thresholds on regulated States, EPA's rule subjects to stricter regulation those States that have done relatively less in the past to control their pollution" and ensures that "[u]pwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution." *EME Homer City,* 572 U.S. at 519. The fact that a particular state may have a very small emissions reduction obligation, and so improve downwind air quality by a very small amount, does not call the approach into question. The fact that a state may have less to do to meet the EPA's selected levels of emissions control may reflect that its

sources are already well controlled. But whether a state's required reductions under a FIP applying this methodology are large or small, the approach allows for a fair alignment of investments in pollution control across all of the contributing states, which is at the heart of the methodological construct the Court approved in *EME Homer City. See Wisconsin,* 938 F.3d at 322 (concluding that the EPA reasonably regulated sources in Wisconsin, a contributing upwind state whose available cost-effective reductions would only benefit downwind air quality "by just two ten-thousandths of a part per billion").

This is not to say that delivering air quality improvement to the downwind receptors is not important—indeed, it is, as the EPA described in the Good Neighbor Plan, a "central component" of the EPA's analysis. 88 FR 36741. If the identified control strategies that were cost-effective on a cost-per-ton basis did not have any effect on downwind air quality at any receptors, this may call into question whether requiring those strategies was worth it.[43] Thus, the Good Neighbor Plan explains that the purpose of the EPA's air quality analysis at Step 3 is to check on whether a level of emissions reduction that appeared cost-effective on a cost-per-ton basis would in fact deliver measurable progress toward attainment of the 2015 ozone NAAQS at the downwind receptors. "These analytical findings cement EPA's identification of the selected EGU and non-EGU mitigation measures as the appropriate control stringency . . . ." 88 FR 36741.

The EPA's analysis in the Good Neighbor Plan demonstrates that with each incremental increase in the stringency of the assessed control strategies, there is also incremental improvement in air quality at the receptors. *See, e.g.,* 88 FR 36743, 36747–

---

[42] *See* Air Quality Modeling Final Rule TSD, 2015 ozone NAAQS Good Neighbor Plan, appendix E, available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1157.*

[43] Even here, however, caution is in order. A highly cost-effective strategy may not deliver incremental air quality improvement from a given baseline because that strategy has already been adopted by sources in a particular state or states. In that case, a rule imposing that strategy would not create new emissions reduction obligations but would be appropriate to prevent backsliding. *Cf. EME Homer,* 572 U.S. at 519–20 (noting the uniform approach appropriately treats states where sources have already invested in pollution control). Likewise, the EPA's good neighbor rules have always applied to both new and existing sources. *See* 88 FR 36685. If a particular industry is not currently present in a particular state but could have high uncontrolled emissions if it located there, good neighbor rules serve as a backstop to ensure a minimum level of emissions performance will be maintained from those sources, in those states that have been deemed to contribute to another state's nonattainment or maintenance issues. Nonetheless, the basic emissions-performance requirements of a good neighbor rule in those cases should not be onerous for a new source.

48 (tables showing air quality improvement at each receptor); Ozone Transport Policy Analysis Final Rule TSD at 70 (table C–12) (Ozone Policy TSD) (showing reductions in the maximum contribution of each upwind State to receptors in 2026).[44] Further, the Agency explained that it could not identify a point of diminishing returns within the suite of emissions control strategies that it ultimately selected. 88 FR 36741. The Agency also cautioned that the purpose of this exercise was not to pinpoint a precise "knee-in-the-curve" but to serve as "a useful indicator for informing potential stopping points." *Id.* Thus, the EPA's review of the effects of different emissions-reduction strategies on air quality primarily helps the Agency ensure that no impactful emissions reduction strategies have been overlooked and that those selected can be anticipated to deliver reductions in ozone at the identified receptors if applied consistently across all of the upwind states linked to each receptor (including each receptor's home state).

Commenters have not put forward an alternative, more cost-effective methodology or set of emissions-control strategies for reducing ozone at the downwind receptors; rather, they seek to avoid emissions control obligations in one state on the basis that the Good Neighbor Plan may not be operative in another. However, the EPA has an ongoing statutory obligation to issue FIPs for those states where it has issued a SIP disapproval or made a finding of failure to submit. In the absence of information detailing that cost-effective emissions reduction opportunities have been overlooked that would have an even greater benefit on ozone levels at downwind receptors, the EPA reasonably concluded that its identification of emissions limitations consistent with the cost-effective emissions control technologies that it has identified to be widely available at the new and existing EGU and non-EGU sources in the states covered by the Good Neighbor Plan passed its Step 3 air quality check, and these measures would constitute a sufficient and appropriate definition of "significant contribution" for these states.[45]

Although the air quality benefits to downwind receptors anticipated in the Good Neighbor Plan would not be fully realized so long as certain states have not yet fulfilled their obligations, this does not serve as a justification for allowing these obligations for those states where the EPA has a responsibility to act to go unaddressed or to be altered. Simply put, the CAA requires each state to address its own contributions to downwind air quality problems, regardless of whether other states have taken action to do so under a SIP or a FIP. That other states contributing to downwind receptors may have their good neighbor obligations stayed or not yet addressed does not relieve other states covered by the Good Neighbor Plan of their own good neighbor obligations under CAA section 110. Given the state-by-state procedural framework of the Act and the need for the EPA to develop equitable and consistent FIPs, it cannot be the case that the EPA must successfully simultaneously resolve all states' good neighbor obligations at once or lose the authority to act. Though the EPA has done its best to achieve consistent, timely, and concordant implementation of these obligations, like the construction of a jigsaw puzzle, each individual piece (*i.e.,* each individual state's obligations) is necessary to complete the whole picture, and not every piece may be connected at once.

Commenters attempt to fault the EPA for developing a methodology that they claim necessarily depends on the inclusion of other states. Setting aside that for the reasons explained here the methodology does not depend on simultaneous inclusion (or even full inclusion, if states address their good neighbor obligations in some other adequate way through a SIP), the problem commenters identify is not in the particular methodology that the EPA uses but in the science of ozone transport as a multistate problem characterized by meteorological variability and overlapping linkages, coupled with the state-by-state implementation structure of the Act. Under these constraints, any methodology would need to take into account the relative contributions of and the effects of air pollution control technologies in other states.

To perform the air quality check for any particular receptor, it makes sense to consider the effect of emissions reductions from all of the states linked to that receptor, not just those covered by a particular FIP rulemaking, because all states must ultimately discharge their good neighbor obligations whether through an approved SIP or a FIP. Thus, the Step 3 air quality analysis is a "test" that serves to confirm that an appropriate degree of emissions-control stringency has been reached for any given state without overcontrolling. It does not depend on the actual, simultaneous inclusion of a certain number of states in a given rulemaking; however, it appropriately accounts for the reality that multiple states are linked to multiple other states and that the amount of emissions reduction necessary to achieve attainment varies among receptors. This complexity, recognized for years by the EPA and by the Supreme Court in *EME Homer City,* 572 U.S. at 514–17, makes it analytically inappropriate if not impossible to assign an obligation to each state that is simply proportional to its contribution to a particular receptor. *See* 88 FR 36683.[46] Nonetheless, that does not prevent the EPA (or for that matter an individual upwind State) from being able to conduct a Step 3 test looking at the effects of uniform control stringencies using a publicly available tool such as the Air Quality Assessment Tool (AQAT). Given the multistate nature of the interstate ozone pollution problem, analysis of the air quality benefit produced by regulating sources in any particular upwind state assumes that other states linked to a common receptor and the home state of that receptor make emissions reductions at a comparable level of emissions control

---

[44] Available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1080.*

[45] As always, states remain free to identify different emissions control measures through a SIP than the EPA has included in a FIP, and it may be possible for a state to demonstrate that it can control other sources to obtain equivalent or greater air quality results at its receptors. A SIP submission to the EPA obtaining those emissions reductions through permanent and enforceable measures applied to its in-state emissions sources accompanied by the appropriate analytical and technical justifications would likely be approvable to replace a good neighbor FIP.

[46] The EPA has previously evaluated Step 3 alternatives to the "uniform approach" taken in the Good Neighbor Plan and prior ozone transport rules, including an evaluation of methods such as a receptor-specific proportionality approach. The alternative methods, as well as potential issues that the Agency identified can be found in the "Alternative Significant Contribution Approaches Evaluated TSD" included in the CSAPR rulemaking docket (Docket ID No. EPA–HQ–OAR–2009–0491– 0077). In responding to comments in that rulemaking about "proportionality" approaches, the Agency identified concerns that included, but were not limited to, requirements of an "extremely high level of accuracy in both the emissions modeling . . . and the air quality modeling" and that "finer-scale emissions data from all sectors . . . . and fine-scale air quality modeling could be needed to resolve differences in cost per air quality impact." The EPA explained that "these data and modeling techniques do not exist and/or are too computationally demanding to be operationally implemented." The EPA continued, "A second challenge for this approach was to identify a single reduction requirement for a particular upwind State, since the reduction requirements relevant to different downwind receptors would vary significantly." *See* CSAPR "Transport Rule Primary RTC" document 743 (Docket ID No. EPA–HQ– OAR–2009–0491–0077).

regardless of whether they are covered by the Good Neighbor Plan.

It is true that the EPA's analysis of air quality change at Step 3 uses state-specific data and calibration factors. *See* Ozone Transport Policy Analysis Final Rule TSD at 43. Commenters may have had uncertainty concerning the respective roles of state-level versus national-level analytical determinations within the air quality analysis at Step 3, with a potential concern being that if the EPA was relying on state-level determinations, then the stringency of the Good Neighbor Plan would be dependent on particular state groupings. But this would over-interpret the role of these particular datapoints in the larger analysis. State-level emissions data and calibration factors ensure an accurate representation of the effects of emissions reductions across the different States. However, this does not imply the Good Neighbor Plan fails to define obligations on a reasonable basis for each state. To the contrary, it confirms that the EPA's analysis already accounts for the emissions reductions and air quality change that can be anticipated from each state individually, rather than merely treating them as an undifferentiated regional mass specific to the group of states included in a particular rulemaking. More importantly, as described above, the regulatory conclusions the EPA drew from the AQAT analysis focused not on the individualized outcomes of each linkage but rather on the averaged and aggregated data drawn from that analysis for the entire country, which "cemented" the EPA's finding that an overall appropriate level of stringency was obtained, without overcontrolling. 88 FR 36741, 36747–48.[47]

Illustrating that the Good Neighbor Plan's regulatory conclusions were drawn from this nationwide assessment of air quality effects of different control stringencies, rather than from the particulars of the 23-state grouping included in the Good Neighbor Plan, the EPA's primary Step 3 air quality and overcontrol analysis in the Good Neighbor Plan included any other

linked upwind states found at Steps 1 and 2 of the EPA's framework, regardless of whether or not they were included in the Good Neighbor Plan, on the view that this was the most appropriate way to analyze the collective effects of identified stringency levels at Step 3. *See* Ozone Policy TSD at 46, 55 (explaining that the EPA included all upwind states modeled to be contributing in this assessment, *i.e.,* including states that were not presently included in the Good Neighbor Plan but might be through a future rule, such as Iowa, New Mexico, and Louisiana[48]). Accordingly, the EPA's Step 3 air quality analysis did not rely on a 23-state scope of coverage, and nowhere in the record for the Good Neighbor Plan did the EPA state or imply that its methodology relied on a 23-state scope of coverage.[49] For any particular receptor, the EPA's analysis looked at the group of upwind states linked to that receptor in the modeling (the numbers of which vary), and also assigned the home state for that receptor a "fair share" (*i.e.,* the same stringency that would be imposed in the upwind states for that receptor). 88 FR 36742 n.238. The analysis did not depend on the actual inclusion of those particular states in the Good Neighbor Plan; it simply looked at what the effect would be if, for any given upwind state and

any given receptor, the other upwind linked states and the downwind state were held to the same stringency level.

Stated differently, the EPA's analysis identified a total of 28 states as contributing at Step 2. 88 FR 36709–12. As such, subject to the caveats in notes 48 and 49 *supra* concerning certain limitations in the data, the EPA appropriately assessed the effect of applying the uniform levels of emissions control stringency across all contributing States to any given receptor (*i.e.,* varying combinations of the 28 states plus home state for each receptor)—regardless of their inclusion in the Good Neighbor Plan—in evaluating whether the Good Neighbor Plan reasonably addresses the "significant contribution" of any particular state.

The emissions control measures identified at Step 3 do not depend on which particular states adopt cost-effective controls as part of the EPA's analysis of air quality benefits. The role of the air quality analysis is simply to verify that the cost-effective controls identified by the EPA for any particular state would, in fact, have an impact on downwind receptors *if* they were uniformly adopted in all states contributing to that receptor (and the home state), without overcontrolling. Whether all of those states ultimately adopt those emissions controls, or do so simultaneously, or adopt equivalent controls but on different sources, or may otherwise develop an alternative approach that is approvable for that particular state, does not affect the EPA's determination at Step 3 that those controls, as to the state(s) where the EPA applies them through FIP(s), are cost-effective—and that the sets of sources within any individual state must achieve performance consistent with those controls to satisfy the state's good neighbor obligations.

Thus, the EPA's analysis of air quality benefits at Step 3 was not limited to the specific set of states expected to be covered by a FIP, but appropriately considered the cost-effective emissions reductions available from all upwind states linked to each downwind receptor (as well as the receptor's home state). Consistent with the Act, that methodology functions as an appropriate analytical method to define any particular state's good neighbor obligations for ozone and does so without requiring, or possessing definitive knowledge, that the same methodology would be applied in other states.

---

[47] Notably, the EPA highlighted that its forward-looking air quality projections are subject to inherent uncertainty given the many factors that influence ozone formation. 88 FR 36750. And the EPA acknowledged that states in the future may conduct updated air quality analysis that may differ from its own analytics in the rule. *Id.* at 36839–40; *id.* n. 405. Still, in the absence of particularized evidence of overcontrol and faced with a concomitant duty to avoid *under*-control, *id.* at 36684 (citing 572 U.S. at 523), the EPA's approach yields a set of emissions reduction obligations that would be reasonable in a robust way across all covered large-emitting sources in any contributing state that may eventually become subject to a good neighbor FIP for the ozone NAAQS.

[48] Due to data limitations at the time of finalizing the Good Neighbor Plan, the analysis did not include an assessment of the effects from non-EGUs in Arizona, even though Arizona is linked through the 2026 analytic year. Otherwise, in the AQAT analysis of the Good Neighbor Plan, data informing the EPA's Step 3 air quality evaluation included every monitor in the contiguous United States, with contributions adjusted for each state that was either linked above 1 percent of the NAAQS in the relevant analytic year or was a home state for the receptor.

[49] The EPA acknowledges that certain language in the Ozone Policy TSD for the Final Good Neighbor Plan may have been inartful or unclear on this point. For example, that document stated at page 3 that it was focused on the "23 upwind States that were linked" and included in that rule. This was true in a sense, because the TSD was done in support of that rule, which covered 23 states. However, the underlying data and evaluation of the effects of emissions change on air quality encompassed the entire contiguous U.S., and the TSD displayed anticipated air quality improvement at identified receptors by reference to all upwind states (and "home" states) and was not limited only to the 23 states included in that rule. Results for Kansas and Tennessee were not displayed in the TSD because a final determination had not been made to consider these states linked based solely on violating-monitor receptors. *See* 88 FR 36707. However, the underlying AQAT spreadsheets used for the Ozone Policy TSD analysis included the reductions from these states in the data made available to understand the effects of the evaluated emissions control strategies. *See, e.g.,* Ozone AQAT Results, tab: "2023_step3_newSCR_wIRA", cols. I–BF, available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-1116*.

c. Overcontrol Assessment

Finally, at Step 3, the EPA "tests" whether its selected uniform emissions-control stringency levels result in any "overcontrol." 88 FR 36749–50. In *EME Homer City,* the Supreme Court held that the EPA cannot "require[] an upwind State to reduce emissions by more than the amount necessary to achieve attainment in every downwind State to which it is linked." 572 U.S. at 521. To find overcontrol, the EPA must conclude that the uniform control stringencies the EPA selected produced more emissions reductions and resulting air quality improvements than necessary to resolve all of any state's linkages to downwind receptors, or more than necessary to bring receptors into attainment. In that case, under the overcontrol holding in *EME Homer City,* the EPA would need to adjust the requirements of the rule to avoid overcontrol. This overcontrol assessment is conducted using the same air quality effects analysis derived from AQAT, described in section III.B.2.b.

If the Good Neighbor Plan were to be suspended from operation in some number of upwind states, this could not result in overcontrol, because the analysis (presented in the Ozone Policy TSD) demonstrates no overcontrol even when all upwind states found to be contributing are included—much less the 23 states included in the originally promulgated Good Neighbor Plan itself.[50] As fewer states are making fewer emissions reductions, the downwind receptors cannot be cleaner than they were under the Good Neighbor Plan's original scope. *See* 88 FR 36749–50.

d. Other Elements of the Non-EGU Step 3 Analysis

To ensure a complete response to the commenters, the EPA has reviewed in greater detail all elements of the Step 3 methodology of the Good Neighbor Plan to evaluate whether any components of its analysis pose a concern that the EPA's analytical findings are not severable among the various states. Two elements of the EPA's technology and cost analysis for non-EGUs in the Good Neighbor Plan incorporate analytical methodologies related to some extent to

the upwind region covered by the rule and warrant further discussion here. These are: (1) the identification of potentially impactful industries in the "Screening Assessment" used in the Good Neighbor Plan to assist the EPA in narrowing the scope of industries to be included in its non-EGU regulations; and (2) the "weighting" of average costs for two non-EGU industries and a specific emissions unit type (boilers) where multiple control technologies were identified at Step 3. The EPA has reviewed, based on the record for the Good Neighbor Plan, whether either of those elements materially influenced the determination of each state's "significant contribution." As explained in the "*Use of Screening Assessment to Identify Potentially Impactful Industries*" and "*Weighted Averaging Costs*" below, they did not. Neither of these aspects of the analysis suggest that the EPA should reach different conclusions as to each covered state's "significant contribution" while the Good Neighbor Plan applies in a different group of States.

Use of Screening Assessment To Identify Potentially Impactful Industries

For non-EGUs, the EPA elected to screen for industries and emissions-unit types appropriate for analysis of cost-effective NO$_X$ reductions. While power plants have consistently been understood to have high levels of controllable NO$_X$ emissions and have been included in each good neighbor rulemaking, non-EGUs have not been consistently addressed. *See* 88 FR 36720. Certain non-EGU industries and emissions units/sources were included in the 1998 NO$_X$ SIP Call, but not in subsequent rules, although the EPA had acknowledged that such sources may necessitate regulation to prohibit significant contribution and had in the past analyzed such sources on a "parallel track" to its EGU analysis at Step 3. *See* 88 FR 36719. For the 2015 ozone NAAQS, the EPA concluded that it could not determine it could eliminate the entirety of the covered states' "significant contributions" to downwind nonattainment by addressing power plants alone. 88 FR 36680–82. To that end, the EPA was required to look beyond the power sector, and when it did so, the EPA determined that certain large industrial sources have substantial amounts of ozone-precursor emissions that could be cost-effectively controlled and therefore, consistent with its longstanding methodology, should be obligated to reduce those emissions, so long as such measures would not result in "overcontrol." *Id.* at 36660–61. Because the potential number of

industries and source types is large, the EPA used a screening methodology to assist in narrowing the scope of industries to be potentially regulated to those with potential cost-effective NO$_X$ reductions.

To screen for industries and emissions-unit types to further assess for cost-effective NO$_X$ emissions reductions, the EPA prepared a "Screening Assessment." [51] In the Screening Assessment, the EPA used emissions and control technology information to screen for industries and emissions unit types where emissions reductions were more likely to be cost-effective and to screen out industries where emissions reductions were less likely to be cost-effective. As part of this analysis, the EPA used air quality criteria to identify how emissions reductions from industries and emissions units would likely benefit downwind areas. *See* Screening Assessment at 1–3. This analysis used modeled nonattainment and maintenance receptors in 2023 and an inventory of sources in those upwind states that were identified using the air quality modeling that was available at the time the EPA was developing the assessment.[52] *See* Screening Assessment, appendix A (table A–3). This modeling had identified 27 states as upwind contributors to at least one downwind receptor. In conducting its screening analysis, the EPA took these states to be broadly representative and appropriate for the purpose of screening non-EGU NO$_X$ sources by industry across a large set of upwind states, as identified by the then-available modeling.[53]

The EPA concluded in finalizing the Good Neighbor Plan that this portion of the non-EGU analysis did not need to be redone on the basis of changes in the scope of coverage of the rule. *See* Good

---

[50] As explained in section III.B.2.b., the primary air quality assessment at Step 3, including for purposes of evaluating overcontrol, looks at the effects on ozone levels of different levels of emissions control across all upwind states found to be contributing to a particular receptor (plus the home state), not just the states included in a particular rulemaking. In the Good Neighbor Plan, the EPA ran the AQAT analysis for a total of 28 linked upwind states, not just the 23 states included in the rule. *See* note 49 *supra.*

[51] Screening Assessment of Potential Emissions Reductions, Air Quality Impacts, and Costs from Non-EGU Emissions Units for 2026, available in the docket at *https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0150.*

[52] We developed the Screening Assessment using inputs from the air quality modeling for the Revised CSAPR Update for 2023 (2016v1), as well as the projected 2023 annual emissions inventory from the 2016v2 emissions platform that was used for the air quality modeling for the proposed Good Neighbor Plan. Screening Assessment at 1–2.

[53] The differences in states identified in the 2016v1 modeling compared to the states the EPA identified as linked for the 2023 analytic year using 2016v3 modeling and the violating-monitor receptor identification methodology are as follows: Delaware and Wyoming were linked in 2016v1 and Arizona, Kansas, and New Mexico were not. The linkages used in the Screening Assessment (for 2023) also reflected a slightly different set of states than the EPA expected, at the time of proposal, to be linked in 2026. *Compare* Screening Assessment at 2 *with* 87 FR 20036, 20041 (proposing to apply non-EGU measures in 23 states, not including Alabama, Delaware, Iowa, or Tennessee).

Neighbor Plan RTC at 104 ("The purpose [of the Screening Assessment] is not a precise replication of exactly which sources contributed exactly how much to any particular receptor during a particular high-ozone event. The purpose is to identify those industries with relatively large emissions sufficient to have interstate effects on ozone levels, and to analyze emissions units within those industries further for cost-effective emissions reduction opportunities."). Thus, the EPA was clear in the record of the Good Neighbor Plan that the Screening Assessment served an important but limited purpose: to screen for industries and emissions-unit types where further analysis was likely to identify more impactful and less costly emissions reduction opportunities. *See also* 88 FR 36740; Good Neighbor Plan RTC at 90–92.

Consistent with the statutory language of the good neighbor provision, the EPA could have chosen to forgo this analysis, which assisted the Agency in narrowing the set of non-EGU industries and emissions source types it considered for inclusion in the Good Neighbor Plan, and include more stationary industrial sources of $NO_X$. *See* CAA section 110(a)(2)(D) (authorizing regulation of "any source or other type of emissions activity" for significant contribution); *see also* 88 FR 36680–81.[54] However the EPA might have proceeded, in the rule the Agency was appropriately informed by a longstanding understanding of regional-scale ozone transport, which is that the control of any large sources of $NO_X$ emissions in linked upwind states will generally beneficially affect downwind ozone levels. 88 FR 36719. While states are afforded discretion under the Act to select the control measures they would prefer to use to meet the Act's requirements, such discretion devolves to the EPA when it steps into the shoes of a state under CAA section 110(c). *Id.* at 36675 (collecting case law). Within the exercise of that discretion, the EPA's method of proceeding made sense. The EPA's approach provided a technically rigorous method for narrowing the industries in a manner that treated each industry similarly. As the EPA explained in rejecting comments that its modeling projections in the Screening Assessment were too imprecise, the Assessment was done not for the purpose of "project[ing] changes in air

quality in an absolute sense," but rather to "conduct a comparative analysis among different industries," where the EPA's modeling techniques "would apply consistently and equally to each industry the EPA evaluated." Good Neighbor Plan RTC at 105.[55]

This approach of identifying uniform emissions control opportunities at the industry-level rather than based on a state-by-state or unit-by-unit impact analysis accords with the way the EPA has analyzed emissions control opportunities from both EGUs and non-EGUs throughout the history of implementation of the good neighbor provision. *See id.* at 92 (quoting 63 FR 57399 (uniformity at industry level "assure[s] equity among the various source categories and the industries they represent")); 88 FR 36683 (explaining that the EPA's analysis of non-EGUs sources "parallels the analysis previously conducted only for EGUs" and "relies on evaluation of uniform levels of control stringency across all upwind states"). When commenters argued that the EPA had not adequately established that their particular facilities were sufficiently impactful to be worth regulating, the EPA rejected this mode of analysis:

[I]t was entirely reasonable, and consistent with prior transport rulemakings to focus the analysis at the industry-level rather than attempt to identify air quality impact thresholds at the unit- or source-specific level. To build on the response above, it is important to keep in mind that regional interstate ozone transport is a "collective contribution" problem, in which the ozone-precursor emissions of many sources combine to create ozone nonattainment and maintenance problems at potentially great distances from individual source emissions points. Attribution of responsibility for this problem is complicated by varying meteorological conditions from year to year and even from day to day. The EPA's Step 1 and Step 2 analysis within the 4-step interstate transport framework is designed to robustly identify where ozone problems are located and which states' anthropogenic emissions contribute to those problems. At Step 3, the analysis shifts to an evaluation of which emissions reductions from those contributing states would be most cost-

effective to achieve to eliminate that portion of the states' emissions that are deemed "significant" and thus must be eliminated. Focusing on entire industries (as the EPA has done in prior rules with its focus on EGUs (*e.g.,* CAIR and CSAPR)) and other industry categories in addition to EGUs (as we did in the $NO_X$ SIP Call) presents an efficient and equitable methodology for identifying where the most cost-effective emissions reductions can be identified at the regional scale.

Good Neighbor Plan RTC at 98 (citing 63 FR 57386); *see also* 88 FR 36685 (similar reasoning supports including new sources of the same type as existing sources in good neighbor implementation plans); *id.* at 36746–47 (explaining that uniform control by unit type avoids risk of production and emissions shifting). In short, when the EPA must devise a federal solution to interstate ozone transport for one or more states, its objective is to implement measures that are comprehensive, durable, and robust, not to engage in a never-ending game of whack-a-mole at each emissions point.

The Screening Assessment was one step along the way of focusing the Agency's limited resources and narrowing the scope of the regulation of $NO_X$ emissions "sources" and "activities"; it was not intended to dictate final determinations regarding "significant contribution." *See, e.g.,* Good Neighbor Plan RTC at 97–99, 101. The EPA concluded when finalizing the Good Neighbor Plan that its initial Screening Assessment—although based on a slightly different group of states than at final (and the use of other data regarding baseline emissions levels and air quality conditions that was subject to change)—had served its purpose in helping to identify a reasonable starting point for further analysis of non-EGU emissions-control opportunities and did not need to be redone. *See* 88 FR 36685, 36719.

The Screening Assessment served that purpose for each state where it had a responsibility to regulate non-EGU emissions, and the Good Neighbor Plan's ultimate identification of non-EGU emissions control strategies to eliminate "significant contribution" is likewise sound for any state or grouping of states that may necessitate such federal regulation. Nonetheless, as is always the case with regard to meeting the CAA's requirements, states remain free to address a different set of sources than the EPA identified in the Good Neighbor Plan if they prefer to regulate through a SIP in a manner different than the EPA proceeded in the FIP. *Id.* at 36842.

---

[54] Had the EPA approached the identification of "significant contribution" from non-EGU emissions sources differently, it still would have needed to assess overcontrol and would have excluded emissions reduction measures falling outside the range of technologies deemed cost-effective.

[55] Again, illustrating the EPA's consistent understanding of this comparative purpose, the Agency rejected other comments calling for the Screening Assessment to be redone on the basis of updated information concerning specific non-EGU facilities, which various commenters attempted to use to argue the EPA's data were out-of-date. "Even if some amount of the emissions identified as potentially controllable in the Screening Assessment are already being achieved, or such potentially controllable emissions cannot be feasibly controlled and are not being required in this final rule, *that does not undermine the Agency's conclusions in the Screening Assessment regarding the potential impact of a given industry.*" Good Neighbor Plan RTC at 120 (emphasis added).

''Weighted'' Averaging of Costs

In the EPA's final analysis of non-EGU representative costs in the Good Neighbor Plan, for two industries (Pipeline Transportation of Natural Gas and Solid Waste Combustors and Incinerators) and a specific emissions unit type (boilers), the Agency identified a weighted average of costs to address multiple control technologies identified in the Step 3 analysis, rather than a single control technology. 88 FR 36739–40 (table V.C.2–3). For those industries and for boilers, the analysis weighted the average cost according to the control technologies that certain sources, anticipated to be subject to the Good Neighbor Plan across the 20 states with non-EGU requirements, might select as their method of compliance.

Representative costs for these sources were calculated by weighting the average costs derived from national data sources by estimated emissions reductions for the applicable control technologies. Non-EGU Memorandum at 5–7. For these industries and for boilers, looking at different groupings of states could result in a different ''representative'' cost (as displayed in the Non-EGU Memorandum at 10 (table 6)).

However, any differences in the identified ''representative'' costs for these sources would not affect the outcome of the analysis. For each of these types of sources, the record shows that the costs associated with each of the different control technologies falls within the range of costs that the EPA had concluded were reasonable to

impose. *See* 88 FR 36746–47. In other words, even if a different group of states produces a higher representative cost when weighted by those states' population of sources, the results still fall within the upper bound of the cost-per-ton that the EPA found appropriate. The EPA's conclusion—that the representative cost was reasonable—would be the same.

For example, for RICE, the following table shows the data sources and cost-per-ton estimates the EPA adapted from the CMDB to inform its determination of representative cost for these sources. These were the figures, adjusted to 2016 dollars, that informed the EPA's average cost derived from national data sources used in the weighting to generate a representative cost figure of $4,981/ton for RICE.

TABLE I—DATA SOURCES AND COST ESTIMATES FOR RICE CONTROLS

| Control technology/engine type | Original reference | $/Ton value |
|---|---|---|
| SCR, 4 Stroke Natural Gas Engines, Lean Burn 17% (of engines in analysis population). | 2003, cost information from CARB 2001 report. | $2,900 (2001 dollars). |
| Non-Selective Catalytic Reduction or Layered Combustion, for SCCs where the firing technology is not specified as to Rich Burn or Lean Burn 36%. | 2009/2000 (from 2009 ERLE study and 2000 Pechan Phase II $NO_X$ SIP call report). | 4,538 (2013 dollars). |
| Layered Combustion, 2 Stroke Natural Gas, Lean Burn 44% | 2009 (ERLE study) | 4,900 (2010 dollars). |
| Non-Selective Catalytic Reduction, 4 Cycle Natural Gas, Rich Burn 3%. | 2000 (Pechan, Phase II $NO_X$ SIP call report). | 422 (1999 dollars). |

Likewise, for MWCs in the Solid Waste Combustors and Incinerators industry, the EPA provided the cost assumptions used for the different control types in appendix B of the Non-EGU Memorandum.

For boilers, the EPA explained that its cost estimates were derived from the CMDB, and the EPA identified a number of assumptions used in developing representative cost figures, which the EPA was clear may not be reflective of all sources' circumstances. Non-EGU Memorandum at 7. Noting that boilers have the highest representative costs among the non-EGU source types, the EPA explained in the Good Neighbor Plan that for individual sources, costs on a per-ton basis could well be higher than the estimated $14,595/ton representative cost, but still be commensurate with the range of costs that informed the identification of the most stringent control strategy selected in the Good Neighbor Plan for EGUs (for which costs at the 90th percentile ran as high as $20,900/ton). 88 FR 36746.

The EPA also emphasized that cost-per-ton figures are only one factor in the Step 3 multi-factor analysis, can vary widely depending on the assumptions used, and the conclusions in the Good Neighbor Plan regarding appropriate

stringency levels were informed by a broader review of how widely adopted and proven various control strategies had become. *Id.* at 36746–47. Because of this, the determinations in the Good Neighbor Plan regarding the appropriate level of emissions control that could be expected of a particular type of source considered not just cost-per-ton estimates, but analysis of which technologies were already in wide use or on which existing standards had been based. Good Neighbor Plan RTC at 62–63. Still, recognizing that individual sources may face circumstances of extreme economic hardship or infeasibility, the EPA also provided a mechanism for sources to obtain alternative emissions limits, among other mechanisms for flexibility in the Good Neighbor Plan, to address outlier cases. *See* 40 CFR 52.40(e). These provisions are adequate to cover any potential gap in the Good Neighbor Plan's estimate of representative costs.

Accordingly, recalculating the weighted average representative cost for these particular non-EGU sources for any particular state or state grouping would not produce a representative cost falling outside the acceptable range. Thus, any change in the weighted average used to derive ''representative''

costs for these industries and emissions unit types resulting from looking at some subset of states would not materially affect the analysis.

3. Step 4

At Step 4, the EPA establishes regulatory requirements to achieve the ''prohibition'' of significant contribution identified at Step 3. CAA section 110(a)(2)(D)(i). Under the Good Neighbor Plan, implementation of these requirements occurs through compliance activities at the source level, for both EGUs and for non-EGUs. Contrary to commenters' allegations, and as explained in more detail here, in section III.B.3., the trading program for EGUs, which is a compliance flexibility, does not depend on an interstate trading region for viability. Because all of the obligations of the Good Neighbor Plan can be met by the sources in each state regardless of the application of the Good Neighbor Plan in any other state, the implementation framework at Step 4 is severable on a state-by-state basis.

This can be seen in the structure of the regulations themselves. The Good Neighbor Plan determines on a state-by-state basis which of the EGU and the non-EGU emissions-control programs (or both) should be applied through

state-specific FIPs. *See* 40 CFR 52.38(b)(2) (as amended by 88 FR 36862–63) (identifying states subject to the Good Neighbor Plan's "Group 3" EGU emissions trading program promulgated at 40 CFR part 97, subpart GGGGG); 40 CFR 52.40(c)(2) (as promulgated at 88 FR 36869) (identifying states subject to non-EGU emissions control requirements promulgated at *id.* 52.41–46). The regulations at 40 CFR part 97, subpart GGGGG and 40 CFR 52.41–46 are uniform in nature. But states are "enrolled" via FIPs into these requirements based on state-specific findings regarding the level of their contribution to other states' ozone problems and how long that contribution is projected to continue into the future.[56]

It is through the application of those uniform programs, as appropriate, in each state, via FIPs, that the Good Neighbor Plan eliminates each covered state's significant contribution, as required by CAA section 110(a)(2)(D)(i)(I). The state-specific coverage of the Good Neighbor Plan (for the 23 states for which originally promulgated), by regulatory program, is as follows:

• EGUs in all covered states except California (22 States total) are required to participate in the Group 3 EGU emissions trading program at the level of stringency associated with near term emissions-control strategies that the EPA found can be implemented in 2023 and 2024.

• EGUs in Alabama, Minnesota, and Wisconsin are only subject to this "near-term" stringency level within the Group 3 Trading Program, and no more, because the EPA found these states are no longer linked to downwind ozone problems in the 2026 analytic year.

• EGUs in 19 States (excluding the three states listed in the preceding bullet) that are covered by the Group 3 trading program, are subject to the enhanced stringency in the budgets that takes effect over 2026 and 2027 because these states are linked through the 2026 analytic year.

• The EPA found California has no cost-effective fossil-fuel fired EGU emissions reductions available at the stringency levels determined in the Good Neighbor Plan and so is not subject to the Group 3 Trading Program at all.

• Non-EGUs in 20 states are subject to the uniform emissions control regulations. Because the EPA found these requirements may take up to three years to be implemented (*i.e.,* until 2026), this number excludes Alabama, Minnesota, and Wisconsin, for the same reason as above: these states are not "linked" in 2026.

TABLE II—COVERAGE OF THE GOOD NEIGHBOR PLAN REGULATORY PROGRAMS

| State | EGU program—near term stringency | EGU program—long term stringency | Non-EGU |
| --- | --- | --- | --- |
| Alabama | X | | |
| Arkansas | X | X | X |
| California | | | X |
| Illinois | X | X | X |
| Indiana | X | X | X |
| Kentucky | X | X | X |
| Louisiana | X | X | X |
| Maryland | X | X | X |
| Michigan | X | X | X |
| Minnesota | X | | |
| Mississippi | X | X | X |
| Missouri | X | X | X |
| Nevada | X | X | X |
| New Jersey | X | X | X |
| New York | X | X | X |
| Ohio | X | X | X |
| Oklahoma | X | X | X |
| Pennsylvania | X | X | X |
| Texas | X | X | X |
| Utah | X | X | X |
| Virginia | X | X | X |
| West Virginia | X | X | X |
| Wisconsin | X | | |

These state groupings illustrate how the application of each set of regulatory requirements promulgated in the Good Neighbor Plan depends on the circumstances of each state, as determined through the analytical application of the 4-step interstate transport framework on a nationwide basis. No particular requirement is applicable in all 23 states, and the workability of the Good Neighbor Plan is not premised on an assumption that it must be applicable in specifically 23 states or any particular number of states.

As a practical matter, compliance is achievable through the at-the-source control technologies on which the EPA's determination of "significant contribution" at Step 3 rested (or their equivalents), because the Good Neighbor Plan does not mandate the use of particular control technologies. For non-EGUs, all requirements are established at the source-specific level. *See* 88 FR 36675. The same is true of EGUs: the stringency of the Good Neighbor Plan is premised on at-the-source, conventional control technologies. *See* 88 FR 36737–39 (tables identifying technology types). The EPA also designed a market-based, interstate emissions trading program to allow EGU sources to achieve their

---

[56] This is identical in structure to how the EPA has promulgated federal good neighbor requirements through multiple prior rulemakings.

*See* 40 CFR 52.38–39 (identifying the enrollment of states into emissions trading programs for ozone season NOₓ, annual NOₓ, and annual sulfur

dioxide promulgated as subparts to 40 CFR part 97, as necessary to address good neighbor obligations for other ozone and particulate matter NAAQS).

required emissions reductions as efficiently and cost-effectively as possible, but that trading program is merely a more flexible means of implementing the source-specific requirements that otherwise apply under the Good Neighbor Plan. Indeed, the enhancements the EPA established for the Good Neighbor Plan's trading program (as compared to prior good neighbor trading programs) were meant to ensure the flexibility of the trading program did not undermine the benefits of defining source-specific emissions controls in the first place, which helps assure that EGU sources in each state have eliminated their own significant contribution and thus provided improvements in air quality to the downwind receptors to which their home states are linked. *See* 88 FR at 36657, 36684, 36752.[57]

Commenters may be concerned that without the participation of all states originally included in the Good Neighbor Plan, market liquidity will be affected, allowance prices will increase, and/or there will not be sufficient allowances available for compliance. But the record of the Good Neighbor Plan shows that these concerns are unjustified.

While interstate trading—especially among sources in a large group of states—would generally increase the size of the allowance trading market and thus may increase market liquidity in ways that can improve market efficiency, the use of a trading program does not render implementation of a good neighbor rule in a smaller group of states, or even a single state, unreasonable. That is because, in the first instance, the good neighbor provision regulates EGU sources, not states. Even within a single state, there would be multiple participating sources to populate and benefit from an emissions trading program. Moreover, the history of the EPA's good neighbor rulemakings shows that these trading programs have continued to provide valuable, effective compliance flexibility even where they cover a smaller group of states.[58] Indeed, each

state's budget is set in the Good Neighbor Plan at levels that provide sufficient allowances for each state, assuming EGUs achieve a level of reduction equivalent to what can be achieved by the at-the-source technologies identified to eliminate significant contribution. 88 FR 36680. And as explained further in section III.C., all of the EPA's good neighbor rules, including the Good Neighbor Plan, are designed with the understanding that states have the option to develop SIPs that remove their sources from a trading program, which necessarily changes the number of states subject to the FIP, and that the number of states covered by FIPs may otherwise change.

As a consequence, the size of the trading regions used to implement the good neighbor provision has both varied between rules and regularly changed within trading programs over time. This has never posed a challenge to compliance feasibility, nor does the EPA have any evidence of allowance shortages occurring in any of these programs. *See* 88 FR 36687 (noting opposite problem of banked-allowance surpluses). For example:

• Currently, Georgia is the only state whose EGUs remain in the original CSAPR "Group 1" ozone season $NO_X$ trading program, which originally included 25 states.

• In 2021, the Revised CSAPR Update created a 12-state trading region to complete the remedy to significant contribution for the 2008 ozone NAAQS (*i.e.,* the original "Group 3" program).

• With the Revised CSAPR Update in place, the 2016 CSAPR Update "Group 2" program trading region was reduced from 22 states to 10 states. *See* 88 FR 36668–69 (reviewing regulatory history).

In light of these successful implementation experiences and given the at-the-source technologies on which the Good Neighbor Plan's EGU budgets are premised, coupled with other flexibilities, even individual-state trading programs would not be expected to unduly affect market liquidity or make allowances either scarce or unaffordable. To the extent the comments may be read as asserting that smaller trading regions would undermine grid reliability, the EPA disagrees for the same reasons. These comments did not present any data or analysis in support of that contention. The EPA thoroughly explained how the

Good Neighbor Plan's regulatory program for EGUs is designed to avoid interfering with resource adequacy and grid reliability, *see* 88 FR 36771–75.

In short, under the Good Neighbor Plan, the sources in each individual state are fully able to comply without regard to what sources in other states are doing—and even where cooperative market-based mechanisms are available to aid in that compliance, those mechanisms remain sound for smaller state groupings or even at the individual-state level despite a smaller marketplace. 88 FR 36760–61, 36817.

Commenters may also be concerned that the application of the Good Neighbor Plan in some upwind states if not operative in others may create a dynamic of competitive disadvantage. However, even if this were the case (and commenters supplied no evidence that it would be), this would not be sufficient justification to suspend the operation of the rule in states where it lawfully could be in effect. As an initial matter, because the good neighbor provision imposes legal obligations on each state individually, it does not allow individual states to defer compliance with their legal obligations based on circumstances in other upwind states. That is consistent with the provision's purpose, which is intended to ensure equity and fairness among states by prohibiting harmful upwind state emissions that impose regulatory, economic, and health burdens on downwind states. *See* 88 FR 36658, 36687, 36741; *see also* 64 FR 28250, 28258–62 (May 25, 1999) (reviewing legislative history of the good neighbor provision and related statutory provisions, which reflects an intent to "equalize the positions of the States with respect to interstate pollution by making a source at least as responsible for polluting another State as it would be for polluting its own State"). The inaction of some upwind states is not an appropriate justification for further relaxing all upwind states' obligations, when it is downwind states who will suffer. That burden will fall not just on downwind communities, but on industries in downwind states with ozone nonattainment problems, who will likely bear greater competitive disadvantages vis-à-vis their competitors in upwind states whose pollution is contributing to the enhanced regulatory burdens they already face under the Act. *See EME Homer City,* 489 U.S. at 519; *Maryland,* 958 F.3d at 1200–01, 1203–04. This consideration is particularly acute given the August 3, 2024, attainment date for compliance with the 2015 ozone NAAQS for Moderate nonattainment

---

[57] Even before the Good Neighbor Plan, following *North Carolina,* the EPA took measures to ensure that interstate trading does not undermine the obligation to eliminate each state's significant contribution. *See North Carolina,* 531 F.3d at 921, *modified on reh'g,* 550 F.3d 1176. *See, e.g.,* Cross-State Air Pollution Rule (CSAPR), 76 FR 48208, 48268–71 (August 8, 2011); 88 FR 36752–53.

[58] The size of the trading region is not the only determinant of liquidity; the relative magnitude of demand for allowances compared to supply is an important factor. For example, inclusion in the program of states with sources that are not well-controlled for $NO_X$ would tend to put upward pressure on allowance prices (and potentially

reduce liquidity). If states with such sources are removed from that program (*e.g.,* due to stays), this may put downward pressure on allowance prices (and potentially increase liquidity).

areas located throughout the country, and the Good Neighbor Plan's objective of further assisting downwind states in time for the 2027 Serious area attainment date. 88 FR 36690, 36695.[59] In any case, in light of the unique ability of the power sector to shift generation among sources in supplying electricity to the power grid, the EPA conducted an analysis in the Good Neighbor Plan of the potential for power generators to shift production and emissions from EGUs in states covered by the Good Neighbor Plan to states not covered by the Good Neighbor Plan and found that the risk, while not zero, was relatively small. Good Neighbor Plan RTC at 604–05. Further, that risk is attendant and unavoidable at the boundaries of any multistate or regional program, regardless of its size and regardless of whether that program uses emissions trading or is based on source-specific emissions limitations, and so not particular to the circumstances here.

In short, the implementation of the regulatory requirements of the Good Neighbor Plan, at Step 4, is achievable by the sources in each state and is therefore severable by state.

## C. Other Features of the Statute and Good Neighbor Plan Supporting Severability

In light of the statutory text and context, the Good Neighbor Plan, like prior interstate transport rules, is designed to be modular—*i.e.,* to apply on a state-by-state basis and to whichever states are presently subject to the EPA's responsibility to issue a FIP. That the Good Neighbor Plan functions to appropriately define and prohibit significant contribution on a state-by-state basis, regardless of the number of states covered, can be seen in a number of other features and elements of the Good Neighbor Plan and by reviewing the history of implementation of the good neighbor provision for ozone across prior rulemakings and case law.

First, as directed by the statute and relevant precedent, the EPA must define

---

significant contribution in such a way that sources in "each State" are held responsible for the elimination of their own significant contribution. CAA section 110(a)(2)(D); *see* 88 FR 36687–88, 36762. The D.C. Circuit's review of a good neighbor rule invalidated in *North Carolina* v. *EPA,* and the EPA's subsequent action to address a specific holding in *North Carolina* concerning regional- versus state-level compliance, helpfully illustrates why, and how, the EPA's current approach avoids any inter-dependency among states' obligations.

In an earlier good neighbor rule, the Clean Air Interstate Rule (CAIR), the EPA quantified emissions reduction requirements at the regional level based on a regional analysis, and then apportioned the responsibility for reducing each pollutant among the contributing states based on either the total allowance allocations for the states' EGUs under the Acid Rain Program (ARP) (in the case of required sulfur dioxide reductions) or the total historical heat input amounts for the states' EGUs, adjusted for the types of fuels used (in the case of required $NO_X$ reductions). *See* 70 FR 25162, 25176 (May 12, 2005); *see also* 88 FR 36668.

In *North Carolina,* the D.C. Circuit found that CAIR had unlawfully defined "significant contribution" at a regional level rather than on a state-specific basis. 531 F.3d at 906–08, 919–21. After this ruling, the EPA took care to ensure the successor rule to CAIR, CSAPR, defined and prohibited significant contribution for each State. *See* 76 FR 48271. It did this by evaluating and selecting appropriate uniform levels of control stringency for the set of upwind states linked to identified downwind receptors and then quantifying and implementing the required emissions reductions resulting from the selected control stringencies independently for each upwind state. *See id.* In other words, at this point in the analysis, the EPA removed from CSAPR (and all subsequent good neighbor rules) the interdependency of a regional solution that *North Carolina* had found in CAIR, as this interdependency resulted in a failure to identify each state's own obligations. In CSAPR, each receptor and the states linked to that receptor were evaluated independently, which led the EPA to establish different regional groupings of states with different levels of emissions control stringency (*e.g.,* in that case, the Group 1 and Group 2 $SO_2$ control programs). *See* 76 FR 48252. The courts reviewing CSAPR in *EME Homer City* further required that the EPA evaluate each state to ensure an otherwise permissible

---

uniform emissions control stringency does not overcontrol the emissions of any particular upwind state. 572 U.S. 489, 521. Taken together, these refinements from CAIR opened up the potential that individual states could be assigned different cost/stringency levels based on whether their receptors (or their linkages to those receptors) would fully resolve at different cost/stringency levels or would fully resolve before additional emissions control measures could be implemented. This state-specific treatment can be seen in the Good Neighbor Plan's recognition that control strategies only available by the 2026 analytic year are not required in Alabama, Minnesota, or Wisconsin, given that their specific linkages were projected to resolve by that year. For the remaining 20 states in the Good Neighbor Plan, no overcontrol was observed in the 2026 analytic year and so no adjustments in the program's stringency were needed. 88 FR 36749.[60]

At Step 4, CSAPR maintained an interstate EGU trading program, but the EPA took steps to ensure that this too complied with *North Carolina* and the statutory obligation to define and prohibit each state's significant contribution. To ensure that each state would eliminate its own significant contribution within the flexible compliance mechanism of an interstate trading program for EGUs, the EPA imposed a constraint on interstate trading within the trading program, through "assurance provisions" that imposed a 3-to-1 allowance-surrender ratio for emissions in excess of a certain percentage of each state's budget. As explained in the Good Neighbor Plan, "The establishment [in CSAPR] of assurance levels with associated extra allowance surrender requirements was intended to respond to the D.C. Circuit's holding in *North Carolina* requiring the EPA to ensure within the context of an interstate trading program that sources in each State are required to address their good neighbor obligations within the State and may not simply shift those obligations to other States by failing to reduce their own emissions and instead surrendering surplus allowances

---

[59] This is also consistent with the EPA's determination that it is necessary and appropriate to extend the Good Neighbor Plan's requirements to CAA section 301(d) FIP areas located within the borders of states whose sources were found to be significantly contributing. The EPA explained in the Good Neighbor Plan that not doing so would pose a risk that such areas would then be targeted for the siting of polluting facilities to avoid the Good Neighbor Plan's requirements, frustrating the purpose of the Good Neighbor Plan and the statute. 88 FR 36691. This concern exists at the "intra-State" level. Second, while it is generally appropriate that equity and consistency should be maintained across all similarly situated jurisdictions, that does not extend to excusing one upwind state of its statutory obligations simply on the basis that the obligations of another upwind state are still pending or unresolved.

[60] Likewise, in the Good Neighbor Plan, we observed a receptor projected to resolve using an emissions control stringency level not requiring non-EGU emissions controls. The Larimer County, Colorado, receptor's maximum design value drops below 71 ppb when the highest EGU stringency is applied (but before non-EGU controls are applied). Thus, if any state were linked only to this receptor, the EGU-only level of stringency would have been the stopping point. However, all states linked to this receptor were also linked to other receptors for which application of both the EGU and non-EGU emissions control stringency did not produce overcontrol. *See* Ozone Policy TSD, appendix H, at 115.

purchased from sources in other States.'' 88 FR 78786.

The features of CSAPR included to address the *North Carolina* decision have been retained in the Good Neighbor Plan and enhanced to further ensure that each state remains responsible for elimination of its own significant contribution.[61] *See id.* at 36687–88, 36762 (citing *North Carolina,* at 906–08, 921; *see also* Good Neighbor Plan RTC at 42 ("[T]he D.C. Circuit has held that the EPA may not implement an emissions reduction program under the good neighbor provision that fails to ensure that each State has eliminated its own significant contribution. *North Carolina,* 531 F.3d at 921."); *id.* at 48 (same).

Second, also consistent with the state-by-state structure of CAA section 110, as recognized in *North Carolina,* the EPA made specific findings regarding its authority to promulgate a FIP for each individual state covered by the Good Neighbor Plan. 88 FR 36689 n.109. Notably, the EPA had originally proposed that the Good Neighbor Plan rulemaking would promulgate FIPs for 26 states, not 23. *See* 87 FR 20036, 20038 (April 6, 2022). The modeling that informed the final rule indicated that Delaware and Wyoming were not linked to any out-of-state receptors, and that Tennessee would only be linked to a new class of "violating monitor" receptors. Thus, these three states were excluded from the final Good Neighbor Plan. Including fewer states in the final rule than were included in the proposal did not alter the approach to defining each remaining states' significant contribution, nor cause any change in each covered state's obligations or the requirements imposed on emitting sources in those covered states. The final modeling also indicated that several additional states were potentially linked and may "contribute significantly," and thus the EPA acknowledged in the final Good Neighbor Plan that these states' obligations still needed to be addressed. *See* 88 FR 36658 (identifying Arizona, Iowa, Kansas, New Mexico, Tennessee, and Wyoming as needing to be further addressed in a subsequent action).[62] Critically, under the EPA's analytical approach to the Good Neighbor Plan, the absence of these states from the final

Good Neighbor Plan did not, in the Agency's view at the time, pose any challenge to finalizing and moving forward with implementing the Good Neighbor Plan for the states included.

Third, the Good Neighbor Plan, consistent with the statute and like all prior good neighbor federal rulemakings, recognizes that states may choose to replace their FIP with a SIP. *See, e.g.,* 88 FR 36838–42 (discussing in detail various options states have for developing SIPs). When the EPA approves a replacement SIP, that state is withdrawn from the FIP, thus changing the number of states subject to Good Neighbor Plan FIPs. In developing SIPs, states may opt to leave the interstate trading program for EGUs in favor of an adequate, alternative approach to addressing their good neighbor obligations. *Id.* at 36841–42. This echoes nearly identical discussions included in prior good neighbor rules, *see, e.g.,* CSAPR, 76 FR 48328. Both the proposed and final Good Neighbor Plan contained an extended discussion of how states could exit the Good Neighbor Plan through several options for submitting approvable SIPs. 87 FR 20149–51; *see also id.* at 20040 ("[T]his proposal will provide States with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution."). In the final Good Neighbor Plan, the EPA explained that it encouraged states to replace their FIP with an approvable SIP, specifically identifying that states could choose to exit the trading program, regulate different sources, or devise adequate alternative methodologies to defining "significant contribution." *See* 88 FR 36839.

Fourth, the EPA's experience with prior good neighbor rules informs its determinations concerning the ability of the Good Neighbor Plan to function sensibly regardless of the number of states included. The EPA has removed states from coverage of prior good neighbor rules (including from interstate trading programs) in the past without any loss of program viability. *See* 88 FR 36669. In addition, at times the EPA has been required to remove specific states from a good neighbor program as a result of adverse court decisions. For example, CSAPR was remanded as to multiple states based on overcontrol concerns in the aftermath of the Supreme Court's decision in *EME Homer City,* but the D.C. Circuit expressly declined to vacate CSAPR, even as to those states. *See EME Homer City Generation, LP* v. *EPA,* 795 F.3d

118, 132 (D.C. Cir. 2015). Subsequent rulemakings moved several states out of the original CSAPR programs, without any issues concerning the feasibility or propriety of the remaining states' obligations. *See, e.g.,* 81 FR 74504, 74506–07 (October 26, 2016); *see also* 86 FR 23056–57. Similarly, in *Michigan,* 213 F.3d at 695, the D.C. Circuit vacated the NO$_X$ SIP Call as to Wisconsin, Missouri, and Georgia, but left the rule in place and remanded without vacatur as to certain issues as to other states.[63] The modular nature of past good neighbor rules has functioned well and ensured that when the scope of a rule might change based on issues specific to particular states, the rule can continue to function properly for the states that remain covered by the rule.

Finally, there are no statements in the record of the Good Neighbor Plan that suggest the EPA considered the Good Neighbor Plan interdependent among states or dependent on exactly 23 states or any other minimum number of states' participation.[64] To the contrary, the severability section in the Good Neighbor Plan preamble indicated the Agency's expectation that the Good Neighbor Plan could be implemented in individual states as necessary. 88 FR 36693. While in one instance, the Good Neighbor Plan did refer to the "interdependent nature of interstate

---

[61] For example, by strengthening incentives for individual units to optimize operation of their emissions controls, the backstop daily NO$_X$ emissions rate provisions and the secondary emissions limitation provisions also both increase assurance that each State's significant contribution will be eliminated within that State. *See, e.g.,* 88 FR 36767–68 and 36799–800.

[62] *See supra* note 19.

[63] The D.C. Circuit has in fact emphasized that the important public health benefits of the EPA's interstate transport rules, as well as the potential disruption to emissions trading markets, counsel against vacatur even when some aspect of the rules may be found unlawful or necessitate re-analysis. *See North Carolina,* 550 F.3d 1176, 1178 (D.C. Cir. 2008); *Wisconsin,* 938 F.3d at 336–37; *EME Homer City,* 795 F.3d at 132.

[64] To the extent any discussions in the Good Neighbor Plan's preamble or its technical support documents suggested that some particular substantive component of the methodology was dependent on a specific 23-state coverage, the Agency clarifies here that such statements were inartful or incorrect. For example, the Agency has reviewed the methodology underlying the graphs displayed in appendix I of the Ozone Policy TSD. We have confirmed that despite headings describing the graphs as being for 22 or for 19 states, respectively, in fact Figures 1 and 2 were compiled using the "Step 3 Configuration" in AQAT that compiled the reductions of all linked states and the home state for each receptor. Figure 3 likewise reflected a compilation of data that was not limited to the states subject to the original Good Neighbor Plan. The references to 22 and 19 states (for 2023 and 2026 EGU stringency, respectively) were simply intended to indicate the number of states in the Good Neighbor Plan for which the data informed obligations being finalized in that rule. *See* 88 FR 36744–45 (explaining that Figures 1 and 2 reflected the AQAT data used to inform the Step 3 determinations concerning EGUs, while Figure 3 was intended to illustrate why further EGU emissions-reduction strategies *not* included in that analysis appeared to be well beyond a notable breakpoint in cost-effectiveness and thus not worth pursuing in the context of defining good neighbor obligations for the 2015 ozone NAAQS).

pollution transport,'' *see* 88 FR 36860, this was in reference to the nature of the pollution problem, not the nature of the EPA's solution. While the variable, interstate nature of ozone transport certainly presents a ''thorny causation problem,'' *EME Homer City*, 489 U.S. at 514, the EPA's solution to that problem when promulgating FIPs, through a consistent application of the 4-step interstate transport framework to each state, is expressly designed to avoid the creation of unworkable interdependencies.

By contrast, commenters' apparent view that the analysis underlying the Good Neighbor Plan would change depending on its scope of coverage at any given moment misapprehends how the Good Neighbor Plan is designed and operates. If commenters were correct that the EPA had designed a good neighbor rule that was contingent for any particular state on whether the rule covered other states, this would seemingly introduce an interdependency problem and render the rule invalid under *North Carolina*. It could also require that the EPA revise a good neighbor rule every time a state opted to impose a SIP to exit its FIP or was moved into a new FIP for a revised NAAQS or to fully address its obligations. The practical problems of such an approach reinforce why this would be an unreasonable way to define states' obligations. It would render good neighbor obligations an ever-shifting target, undermining regulatory certainty for sources and states. The Good Neighbor Plan is designed to avoid such complications.

*D. Whether Judicial Stays Would Justify Re-Analysis of the Good Neighbor Plan*

The comments discussed in section II.B. may be interpreted to argue that the Good Neighbor Plan must be re-analyzed where a court stays, as to a particular state or states, either the rule itself or an antecedent action such as the SIP Disapproval that is a predicate to the exercise of FIP authority under CAA section 110(c)(1). Courts may enter temporary stays of agency actions pending judicial review to preserve the status quo. A stay order is not a final judgment and in itself does not alter or force a change in the substantive analysis an agency has applied in taking the action under review. Thus, stay orders would not alter the analysis of good neighbor obligations for the 2015 ozone NAAQS for any particular state, and the EPA would come to the same result as was already reached, because the analytical underpinnings and the implementation of the Good Neighbor

Plan do not depend on the specific number of states that it covers.

The comments may also be interpreted as an assertion that the Good Neighbor Plan would not function or would be unreasonable because stays may be put in place, or because a large amount of the emissions reductions that the Good Neighbor Plan calls for would become unenforceable pending judicial review. However, this does not serve to identify what technical and analytical conclusions the Agency reached through its notice-and-comment rulemaking were flawed or must be changed. The obligations as defined for each state remain promulgated even if they are stayed pending judicial review.

Similarly, the effects of merits holdings in the SIP Disapproval litigation or a vacatur of the SIP Disapproval as to a particular state would not necessarily require a change in the way the EPA may lawfully define that state's good neighbor obligations in a FIP, much less those of other states. To be sure, in general a vacatur of a SIP disapproval would at a minimum require that the FIP remain stayed as to that state, pending action on remand (if that disapproval had been the sole basis for the exercise of FIP authority). And the EPA will always comply with the final judgments of the courts. However, the degree to which a change in analysis for a particular state, with respect to the EPA's action on its SIP submission, would be required following any merits holdings in the various cases challenging the SIP Disapproval would depend on the nature of those holdings, as to that state, which is speculative at this time. Whether such holdings would in turn require a change in the EPA's analysis or outcomes concerning other states' SIP submissions is still more speculative, and whether any such changes could then separately impact the EPA's approach to defining the obligations of the state in question through a FIP, much less the obligations of other states via FIPs, is more speculative still.

Several commenters urge that the EPA must simply accept their view, or the view of commenters on the SIP Disapproval, that either or both of the rules are legally or procedurally flawed and will not survive judicial review. The EPA has addressed the substantive arguments raised in such comments elsewhere in the record of the Good Neighbor Plan, or it has indicated that it had addressed those issues in the SIP Disapproval and those matters are not within scope of the rule. *See* Good Neighbor Plan RTC at 6–8, 149–51, 155; *see also* section II.B. supra (summarizing responses to comments in

the original Good Neighbor Plan record). Where the Agency has reviewed such comments and is satisfied that it is acting lawfully, mere speculation that a reviewing court may disagree cannot supply a reasoned basis for the Agency to stay, modify, or withdraw its rule.

Thus, the methodology and regulatory programs of the Good Neighbor Plan are reasonably designed and operate to define the obligations of each state, in a manner that is severable on a state-by-state basis. While the analytical methods, technical analyses, and policy judgments that informed the Good Neighbor Plan were developed and conducted consistently across the nation, they ultimately produced a determination of significant contribution at the state level. The implementation of the measures necessary to eliminate significant contribution is achievable by the sources within each state, irrespective of other states' participation. It would not matter if there were one state or 50 states in the Good Neighbor Plan—the methodology and the result for any particular state—*i.e.,* the definition of ''significant contribution to nonattainment and interference with maintenance'' under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS—would remain the same.

The EPA acknowledges that although the substantive circumstances of the states remain constant, the circumstances of the rulemaking and litigation are likely to remain in flux in the short-to-near term. Courts that may grant stays pending judicial review may later affirm the SIP Disapproval or may remand the SIP Disapproval as to particular states, with or without vacatur. Indeed, both the $NO_X$ SIP Call and CSAPR were ultimately implemented despite initial stay orders, and notwithstanding that some elements of each rule were remanded without vacatur. *See, e.g., EME Homer City,* 795 F.3d at 138; *Michigan,* 213 F.3d at 695. Should there be any remand of the SIP Disapproval, the EPA will have to act on that state's SIP submission again, in accordance with the court's holdings. *See Calcutt* v. *Federal Deposit Ins. Corp.,* 598 U.S. 623, 629 (2023). And, at any point, any state may submit a new SIP to the EPA, and the EPA will review that SIP. Ultimately, under the statute, every state will need to be covered by either an approved SIP or a FIP that meets the requirements of the good neighbor provision—with the number subject to each potentially changing at any point.

Finally, the EPA's conclusion that the Good Neighbor Plan is severable also reflected the important public health

and environmental benefits of the rule in eliminating significant contribution and to ensure to the greatest extent possible the ability of both upwind states and downwind states and other relevant stakeholders to be able to rely on the rule in their planning. 88 FR 36693. *Cf. Wisconsin,* 938 F.3d at 336–37 ("As a general rule, we do not vacate regulations when doing so would risk significant harm to the public health or the environment."); *North Carolina* v. *EPA,* 550 F.3d 1176, 1178 (D.C. Cir. 2008) (noting the need to preserve public health benefits).

## IV. Statutory and Executive Orders Reviews

The EPA's determinations under the relevant statutory and Executive Order reviews for the Good Neighbor Plan can be found at 88 FR 36856–60. This document provides further explanation in response to comments concerning a particular aspect of the Good Neighbor Plan and does not alter or amend any of the requirements of the rule. Additional information about the relevant statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

The Office of Management and Budget (OMB) has determined that this document is significant for purposes of review under Executive Order 12866, as amended by Executive Order 14094. Accordingly, the EPA submitted this document to the OMB for Executive Order 12866 review. Documentation of any changes made in response to the Executive Order 12866 review is available in the docket.

### B. Judicial Review

Judicial review of the Good Neighbor Plan is in the United States Court of Appeals for the District of Columbia Circuit for the reasons stated in the final rulemaking document. *See* 88 FR 36859–60. Petitions for review of the Good Neighbor Plan are currently pending in that court, and this document completes proceedings on remand of the record as ordered by that court. *State of Utah et al.* v. *EPA,* No. 23–1157 (D.C. Cir. September 12, 2024). The D.C. Circuit retains jurisdiction over the case.

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2024–28739 Filed 12–9–24; 8:45 am]
**BILLING CODE 6560–50–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–HQ–ES–2023–0067; FXES1111090FEDR–256–FF09E21000]

RIN 1018–BG69

### Endangered and Threatened Wildlife and Plants; Endangered Species Status for the Fluminense Swallowtail Butterfly, Harris' Mimic Swallowtail Butterfly, and Hahnel's Amazonian Swallowtail Butterfly

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), determine endangered species status under the Endangered Species Act of 1973 (Act), as amended, for three butterflies endemic to Brazil: the Fluminense swallowtail (*Parides ascanius*), Harris' mimic swallowtail (*Eurytides* (=*Mimoides*) *lysithous harrisianus*), and Hahnel's Amazonian swallowtail (*Parides hahneli*). This rule extends the Act's protections to these species.

**DATES:** This rule is effective January 9, 2025.

**ADDRESSES:** This final rule, comments and materials we received on the proposed rule, and supporting materials that we used in preparing this rule, such as the species status assessment report, are available at *https://www.regulations.gov* at Docket No. FWS–HQ–ES–2023–0067.

**FOR FURTHER INFORMATION CONTACT:** Rachel London, Manager, Branch of Delisting and Foreign Species, Ecological Services Program, U.S. Fish and Wildlife Service, MS: ES, 5275 Leesburg Pike, Falls Church, VA 22041–3803; telephone 703–358–2171. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:**

### Previous Federal Actions

Please refer to the proposed listing rule (88 FR 48414, July 27, 2023) for the Fluminense swallowtail butterfly, Harris' mimic swallowtail butterfly, and Hahnel's Amazonian swallowtail butterfly for a detailed description of

previous Federal actions concerning these species. Hereafter in this document, we will abbreviate their common names by removing the word "butterfly" and referring to these species as "swallowtails."

### Peer Review

A species status assessment (SSA) team prepared an SSA report for the Fluminense swallowtail, Harris' mimic swallowtail, and Hahnel's Amazonian swallowtail. The SSA team was composed of Service biologists, in consultation with other species experts. The SSA report represents a compilation of the best scientific and commercial data available concerning the status of the species, including the impacts of past, present, and future factors (both negative and beneficial) affecting the species.

In accordance with our joint policy on peer review published in the **Federal Register** on July 1, 1994 (59 FR 34270), and our August 22, 2016, memorandum updating and clarifying the role of peer review in listing actions under the Act, we solicited independent scientific review of the information contained in the Fluminense swallowtail, Harris' mimic swallowtail, and Hahnel's Amazonian swallowtail SSA report. As discussed in the proposed rule, we sent the SSA report to seven independent peer reviewers and received four responses. The peer reviews can be found at *https://www.regulations.gov.* In preparing the proposed rule, we incorporated the results of these reviews, as appropriate, into the SSA report, which was the foundation for the proposed rule and this final rule. A summary of the peer review comments and our responses can be found in the proposed rule (88 FR 48414).

### Summary of Changes From the Proposed Rule

In preparing this final rule, we reviewed and fully considered all public comments received during the comment period, and we make no substantive changes from the July 27, 2023, proposed rule (88 FR 48414). We considered all relevant references provided by commenters in our final determination and incorporated them into this final rule (see *Habitat Loss and Degradation* and *Capture,* below).

### Summary of Comments and Recommendations

In the proposed rule published on July 27, 2023 (88 FR 48414), we requested that all interested parties submit written comments on the proposal by September 25, 2023. We also contacted appropriate Federal